Kathleen S. McCREARY, David Drabkin, Ann F. Cawley, Angelina J. Messenger, Edward R. Napolitano, Charles E. Butler, John D. Hawkins, Nancy G. Stegar, Richard Cacciato, Carol Ann Pascal, Mary T. Thompson and Gregory De-Sousa, Plaintiffs,

v.

Jean STONE, Elisabeth M. Brown, Edward Falkenberg, Beatrice K. Underweiser, the Board of Trustees of the Village of Scarsdale and the Village of Scarsdale, Defendants.

The SCARSDALE CRECHE COMMITTEE, Patricia Curran, Cynthia Barsuhn, Grace Fellows, Doris Adler, Mary Tully, Joan Mann and Maria Pedulla, Plaintiffs,

v.

The VILLAGE OF SCARSDALE and the Board of Trustees of the Village of Scarsdale, Defendants.

Nos. 83 Civ. 987 (CES), 83 Civ. 3266 (CES).

United States District Court, S.D. New York.

Dec. 8, 1983.

Vincent K. Gilmore, Michael J. Murphy, New York City, for plaintiffs The Citizens Group, et al.

Marvin Schwartz, Sara Goodman, New York City, for plaintiffs The Scarsdale Creche Committee, et al.

Kramer, Levin, Nessen, Kamin & Frankel, Siff & Newman, P.C., New York City, for defendants; Marvin E. Frankel, Steven E. Greenbaum, Adam E. Eilenberg, Stuart I. Parker, Mark Landman, Audrey Rogers, New York City, of counsel.

## OPINION

STEWART, District Judge:

In these cases we are asked to decide whether defendants, the Village of Scarsdale (the "Village"), its governing board of trustees (the "board of trustees" or the "trustees" or the "board") and, in 83 Civ. 987, two individual trustees,[1] acted within the bounds of the Constitution in denying access to a Village-owned park for the purpose of displaying a privately owned "creche" or nativity scene. There are two groups of plaintiffs (collectively they will be referred to as the "plaintiffs") in this consolidated action. The plaintiffs are known as the Scarsdale Creche Committee (the "Creche Committee") and the Citizens Group. Plaintiffs bring their claims pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983 asserting a denial of free speech and free exercise rights as guaranteed by the First and Fourteenth Amendments. The Creche Committee also alleges a denial of equal protection. Plaintiffs seek both a declaration that their rights have been denied and a permanent injunction against further denials. The case was tried on July 20, 1983 and the record consists exclusively of stipulations of fact, depositions, answers to interrogatories, and exhibits. The parties do not dispute the authenticity of any documents submitted as exhibits, and have agreed that the depositions and answers to interrogatories may be received in evidence as if given as testimony at trial. Jurisdiction is premised on 28 U.S.C. §§ 1331 and 1343(3). This opinion sets forth the court's findings of fact and conclusions of law.

## I BACKGROUND

The Village of Scarsdale is a municipal corporation located north of New York City in the County of Westchester. It has a population of about 17,000 people, Tooley dep. at 38, and its residents include persons of varying religious faiths.[2]

In 1931 a small plot of land, which has come to be known as Boniface Circle, was deeded to the Village of Scarsdale. Boniface Circle is one of a number of parks in the Village. It has a dimension of 3,255 square feet, is bounded on all sides by roadways and is surrounded by both residential and commercial property, the latter including professional offices, a restaurant, and sporting goods, clothing (for men, women and children), grocery, and other stores. The park is oval in shape, largely grass-covered, and is considered to lie in the center of the retail business district of the Village.

Located in the park are a large evergreen tree, various hedges, two benches, two lamp posts, a walkway and a flagpole. Also located in the park is a war memorial to the veterans of World War II. The war memorial, built in 1949, consists of a stone wall on which plaques recalling the names of war dead are mounted. In front of the wall is a small terrace of flagstones and some steps leading up to the slightly higher ground level of the rest of the park. The entire memorial occupies about one-sixth of the park. Boniface Circle is visited year round by persons of "all stripes", id. at 84, for what appear to be varying reasons, among them as a way-through for pedestrians from one street in the business district to another. Parking meters surround about half of the park.

Over the years access to Boniface Circle for assembly or speech purposes has been somewhat limited. A detailed description of such uses is set out below in the portion of this opinion discussing Boniface Circle's status as a "public forum." Suffice it to

---

1. In a memorandum decision dated July 20, 1983, this court dismissed damage claims against the four individually named defendants, and insofar as they were no longer trustees, dismissed all equitable claims against defendants Stone and Brown.

2. Although the parties have not stipulated as to the religious composition of the Village, the record in varying places suggests that the community of Scarsdale includes adherents of Christian, Jewish, and several "Eastern" religious faiths. The Village also has a Mormon Church and followers of the Bahai faith and several newer religions such as that of the Reverend Moon.

say here that applications for its use for First Amendment purposes have historical-ly been passed upon by the board of trus-tees, the Village's governing body, that there are no statutes or regulations setting forth guidelines upon which the board bas-es its decision to grant or deny access, and that there are no statutes or ordinances which otherwise set forth guidelines as to how and when Village property may be used for such purposes.

One of the primary uses to which Boni-face Circle has been put is as a locus for Christmas celebration. Every year the Vil-lage has allowed the Chamber of Com-merce to decorate the two lamp posts in the park and the lamp posts surrounding it with ornaments of various kinds. The Town Club, a private organization, has been granted access to Boniface Circle in 1959, 1962 through 1965, 1968 through 1971 and in 1982 to hold a Christmas Carol Sing. On other Occasions the Town Club has met on other Village-owned property for caroling. In 1982 the Village itself installed Christmas ornaments on the large evergreen tree in Boniface Circle, and dis-played them for two and one-half weeks. And, beginning in 1956 and continuing through December 1980, Boniface Circle has been the site of a privately owned creche, displayed for about two weeks each year.

From 1957 through 1980 the sponsor of the creche display has been the Creche Committee. The Creche Committee is a private unincorporated association of seven Protestant and Catholic churches. Five of the churches are located in the Village of Scarsdale and two are located outside the Village but have a "Scarsdale, N.Y." post office address. Each church is represented on the Committee by one person and each pays a small annual donation to defray the cost of maintaining and displaying the creche. Except for a period prior to 1977 when the Village paid for the electricity to light a small light bulb in the creche, the

entire cost of displaying and maintaining the creche has been borne by the Creche Committee. Since 1977 the creche has been unlit altogether.

The creche which since 1957 the Creche Committee has displayed at Boniface Circle consists of a wooden frame, approximately six feet high at the tallest point, and drop-ping off on both sides to about three and a half feet. The frame is nine feet long, three feet deep, and is covered on the in-side by an oil painting. Placed inside the frame are nine hand-carved wooden figures ranging in size from six and one-half inches to three and a half feet. The creche is intended to portray the birth of Jesus Christ.

In each year from 1957 through 1983 the Creche Committee has submitted a written application to the board seeking permission to display the creche at Boniface Circle. In 1981 and 1982, for the first time, the trus-tees denied permission. In 1981 the Creche Committee accepted an offer to display the creche across the street from Boniface Cir-cle on private property belonging to the Frog Prince Proper Restaurant. In 1982, the Creche Committee elected not to dis-play the creche at all when its application for Boniface Circle was denied. The board vote to deny permission to erect the creche was 4–3 in both 1981 and 1982. The 1983 application is still pending. Also pending is an application to display a creche by the Citizens Group, a private unincorporated association of persons not representing churches. The Citizens Group first applied to display their creche in December 1982 [3] after the Creche Committee's request for that year was turned down. The Group reapplied in early 1983 to display their creche the following December with the apparent intention of bringing this suit if the application was not approved. The board of trustees has taken the position that it should not act on the pending appli-

---

**3.** To be precise, the December 1982 application was made by a group of individuals, four of whom are now plaintiff members of the Citizens Group. It appears that this application was to

display the same creche that the Citizens Group now seeks to display in accord with its 1983 application.

cations for 1983 while this lawsuit is under submission.

In recent times the question of whether the board should permit the displaying of the creche at Boniface Circle has been hotly contested, but it has not always been so. The original application by the Creche Committee in 1957, which expressed a desire to display the creche in order to convey "the real significance of Christmas" (Stipulation of Fact, hereafter "Stip.", 8, Ex. 3), was unanimously approved by the board as were all subsequent applications through 1972. However, as early as 1960 events began to transpire which made what had been a routine approval by the board, not routine at all. In 1960 the American Jewish Congress, prompted by members of its Scarsdale chapter, wrote the board expressing concern over the placement of a "religious display on public property." The letter stated, "We, as members of the Jewish faith, find religious display natural and acceptable on Church property, but are distressed by them [sic] when they appear in a public place which is shared by all residents of our community." The letter asked the board to "safeguard the neighborly feeling in our community by arriving at a decision which will strengthen the American principle of separation of Church and State." (Ex. 6).

The board, as it had in the past, unanimously approved the creche application for 1960, but the next year it appointed a "Special Committee" to study and report on the issue. In 1962 the Special Committee recommended after meeting with persons of differing views, including those with legal opinions, that there be "no change" in the board's policy of allowing the creche (Ex. 8).

In January of 1963 the Scarsdale Chapter of the American Jewish Congress again appealed to the board to change its policy adding that "many members of the Jewish Community believed that their feelings ... have been disregarded ... [in] an area involving a great deal of emotion" (Ex. 9). In response, the Special Committee arranged a meeting between those with divergent views on the creche and a professor at New York University in the field of Human Relations. No recommendation resulted and the board continued its unanimous approval of the creche over the next ten years.

In 1973 unanimity of board voting ended. For the first time one of the seven Village trustees abstained on the creche issue, and the following year the same trustee again abstained. In 1975 the trustee again abstained and on this occasion, for the first time, one trustee voted to deny the creche application. At least one negative vote was cast in every succeeding year thereafter through 1979. In 1980, three trustees voted no, and in 1981 and 1982 four trustees, constituting a majority, voted to deny permission for display of the creche. A review of the statements made by trustees abstaining or voting to deny the creche application, discussed in more detail below, indicates that these trustees were concerned with violating either the letter or spirit of the constitutional prescription that there be a separation of church and state.

The voting record of the trustees after 1972 reflected a growing division both on the board and also in the community over the creche. In 1975 the board considered the letter of (apparently) a resident who opined that the creche's placement on public property was unconstitutional. The board directed its Village Attorney to look into the matter. In 1976 another Scarsdale resident advised the Village Attorney that if the Village Attorney concluded that the display was lawful, the resident would commence litigation. Shortly thereafter, a lawsuit was brought challenging the Board's annual approval of the creche application, but the suit was dismissed for procedural reasons. *See Rubin v. Village of Scarsdale*, 440 F.Supp. 607 (S.D.N.Y.1976).

In response to the escalating division, a group of ten members of the clergy from five Scarsdale churches wrote to the board offering their respective church properties, on an annually rotating basis, for display of the creche. With their proposal the clergymen offered the following "statement":

The symbols of religion say different things to different people. A Creche, for example, symbolically makes a particular religious statement which is not held by all.

In keeping with our respect for one another's beliefs and in keeping with our government's position to protect religious freedom without promoting or restricting particular religious views, we believe that it is inappropriate to use public property to make a religious statement. The freedom here involved is the right of each individual within the community to be assured that no certain religious symbol is presumed to represent him on the property which belongs to him in common with the fellow members of his community.

This is not to say that religious symbols should not be seen in a community. Homes, media announcements and places of worship can be used by those wishing to call attention to their beliefs. In this way, the religious pluralism and freedom which we enjoy in this country are best served.

Our proposal, therefore, is not to remove the Creche from public view but rather to move the Creche to a location which is not public property. (Ex. 62, pp. 3–4).

In the same year, 1976, the clergy of yet another church wrote the Village Mayor to express opposition to moving the creche to church property. This letter expressed the view that an "overwhelming majority" of the church's "more than 1000" parishioners believed that the "tradition of eighteen years" of displaying the creche at Boniface Circle should not be changed. The letter suggested that "if the creche is excluded from town property quite logically the scheduled singing of Christmas carols ... [and the displays of] Christmas trees and wreaths [should not] be permitted on public property." (Ex. 42).

The Village board responded to the growing controversy in 1976 by asking the board-appointed Human Relations Advisory Council ("Advisory Council") to make an appraisal of community attitudes regarding the creche. From 1976 to 1978 the Advisory Council recommended that "in the interests of community relations" permission to erect the creche be granted (Stip. 29(a)). The Advisory Council was of the view that the creche's presence at Boniface Circle was "accepted by a majority in the Scarsdale community" (Ex. 44). In 1980, "[d]ue to increased and diverse comments over the approval of the creche's placement in Boniface Circle during the 1979 Christmas season" the board again asked the Council to render a report on the issue (Ex. 46). On this occasion, the Advisory Council advised the board:

All members of the Council feel that the Creche would be placed more appropriately on non-public property. All possible avenues have been explored. Church sites are not acceptable to the Creche Committee and suitable private property locations are not available. After consultation with the Village Attorney, the Council sees no legal problem as no public time or money is involved. The Council agrees unanimously that it is less devisive [sic] to good community relations to allow this long standing tradition to be maintained rather than to deny permission. (Ex. 46).

The Advisory Council made similar findings in 1981 and 1982, but in each year "it urged the Creche Committee to seek other sites." (Stip. 29(b)).

Apparently with the hope of quelling the dispute, the board began in 1976 requiring that the Creche Committee display a sign next to the creche indicating that the display was not sponsored by the Village. From 1976 through 1980 a small unlit sign was implanted next to the creche stating, "This creche has been erected and maintained solely by the Scarsdal[e] Creche Committee, a private organization." (Ex. 29). The dimensions of the sign are approximately 10¾ inches by 14½ inches, its decal letters measure ½ inch high. It appears that the sign was not readable by persons standing on the perimeter of the park or traveling past Boniface Circle in a car, although the creche could have been

recognizable from such at either point. On the other hand, one observing the creche head-on and from a few feet away, the vantage point from which its sponsors no doubt intended that it be viewed, would have been able to read the sign.

When the board of trustees voted to discontinue its long history of allowing the creche in 1981, a small uproar ensued which was refueled the following year when the board again voted to prohibit the creche. Former Mayor Jean Stone, who was identified in local newspapers as having cast the "deciding vote," received several box loads of mail on the subject, as did the board. In the Mayor's view many letters—at least 100—had an antisemitic tone. An unknown number of such letters, many unsigned, may have come from outside of Scarsdale, where news of the creche denial had spread. The Mayor testified that the letters she received often assumed incorrectly that she was Jewish because she voted against the creche (Stone dep. at 60–64).

Many dozens of the letters received by the board or the Mayor, or which were printed in the local press on this issue, have been made part of the record.[4] A significant number of those opposed to the board's decision denying the creche application (see Ex. 63) perceived the problem as one stemming from a difference between Christians and Jews, although only a handful were what could be called blatantly antisemitic. A few of the opposition letters expressly stated a view that the problem was not a Christian-Jewish one. Most of the opposition letters expressed "shock" or "disappointment" with the board's decision. Some argued that as long as access for the display of religious symbols was made equally available to other religious points of view, the creche should be displayed, and some were of the view that there was a constitutional right to have the creche displayed. Others, attempting to show the extreme consequences of the board's deci-

sion, argued that consistency would require the banning of caroling and wreaths from Boniface Circle, or even the sale of Christmas cards downtown. Some argued for a boycott of merchants in the downtown area, a plan which Mayor Stone believed was at least partly inspired by anti-Jewish sentiment. A few letters support the Mayor's conclusion. A number of opposition letters suggested that the board's decision constituted an attack on religion at a time when a national return to religion was needed. Many letters were in the form of petitions. One such letter/petition, subscribed to by about eighty or so signatories, stated, "Unless we are mistaken the United States is regarded by the world as a christian [sic] country, and the creche is simply a symbol of our christianity." Many letters deplored the ending of what they described as a "Village" or "Scarsdale Tradition." The letters at times refer to the creche as the "Scarsdale Creche."

A fewer number of letters, but still a great many, were received praising the board's decision (see Ex. 62). Quite a few called the decision "courageous," and most generally expressed "thanks." The commonly cited reason for supporting the board's decision was that it was improper to have religious symbols on public property, typically because the park belongs "to all the people in the Village." Some saw the display as primarily aimed at "teach[ing] the rest of us that Scarsdale is still a Christian community." Others thought it was wrong for the "government to facilitate wholly religious exhibits," and suggested that in the public mind "Boniface Circle in the center of the village, represents and is identified with Scarsdale and the people of Scarsdale." One letter, published in a local newspaper, espoused the view that "the potent impact the message conveyed ... [from] public premises upon which the religious symbol rests could not be purchased for money." A significant number of letters in support of the board's decision came from persons

---

**4.** A description of the mail and newspaper editorials which follows is intended to be illustrative and not exhaustive.

who identified themselves as Christians. One of these letters expressed the view, a view shared by the Mayor, that many non-Christians had over the years been reluctant to express their felt opposition to the creche. Another likened the request to have Boniface Circle bear a religious display to a request to have the "government ... say [a person's] prayers for him," and a third saw the request as an "attempt to use [the] government to express [a] religious point of view."

Local newspapers (see Ex. 66) were generally supportive of the board's recent decisions, both pro and con, on the issue of whether to allow the creche. An editorial in early 1980 stated, "the questionability of the Village even seeming to be promoting religion is particularly great here where so much of the population does not belong to the religion which the display ... can be considered to be promoting." Nevertheless, the paper supported the board's recent decision to allow the creche because "[a]fter more than 20 years, it would be clearly more offensive suddenly to bar it than to permit it again." When the board voted to deny the creche application in 1981, an editorial stated:

> The creche committee, had it heeded village appeals to find another location, could have averted this year's divisiveness. In the wake of the village's decision, the committee's current stance to keep the creche "boxed up" this year not only appears petulant, but it must cast doubt on the committee's true motives.
>
> Community good will would be better served if the creche committee would accept, with grace, the village board's decision and place the creche at an appropriate location. This could be the healing step to avert divisiveness in future years.

As the editorial suggests, the issues of whether 1) the Creche Committee or, for that matter the Citizens Group, has available to it private property on which to place the creche, and 2) the creche proponents have actively sought to locate such property, have been issues of concern to the community and the board of trustees. Former

Mayor Stone, for example, who in 1979 voted to allow the creche at Boniface Circle, took into consideration what she believed was the Creche Committee's unwillingness to seek out an alternative private site for the creche in later voting to deny access. When asked why the Creche Committee turned down the idea of rotating the creche among church properties, Patricia Curren, who is the chairperson of the Creche Committee, gave several reasons. The first was that "it would destroy the ecumenical aspect of the Creche Committee." The other reasons were that some of the properties were not centrally located, some had topographical problems, and some already had creches (Curran dep. at 55). Offers to make either the Scarsdale Congregational or the Community Baptist Church a permanent home for the creche display, extended after the board denied access to Boniface Circle, were rejected for "topographical" and "landscaping" reasons. Id. at 17–18. While the other stated reasons may contain some merit, the first reason, a desire that the creche speak an "ecumenical" message, and the perception that this goal would best be achieved if the creche spoke from public land, appears to have been preeminent. The record indicates that the Creche Committee did not initiate, and in some instances did not even follow up leads which could have produced a suitable private site. Further, the Congregational and Baptist Churches appear to be accessible and central to residents, and the topographical problem of the former church, sloping grounds, seems surmountable. Lastly, the Creche Committee declined to display the creche at the Frog Prince Proper Restaurant in 1982, located across the street from Boniface Circle, and accepted an offer to do so in 1981 only reluctantly. See Id. at 12–15. We note, in contrast, that the Creche Committee seems to have been fully willing to displaying the creche from two other public sites which were discussed. See Id. at 8–10. In short, it appears that a dominant reason why the Creche Committee has wanted the creche at Boniface Circle is because Boniface Circle is *public* land. The position of the

Citizens Group on this issue is simply that it has the right to place its creche on public property and therefore is not willing, pending the outcome of this lawsuit, to settle for a private site. *See* Butler dep. at 48; McCreary dep. at 84–85.

The applications by the Creche Committee and the Citizens Group which have been denied or are pending vary in terms of the time period sought to display the creche. Prior to 1980 applications by the Creche Committee requested only that the display be permitted during "the Christmas season." As noted, it appears that displays were permitted for about two weeks. In 1980 and 1981 the Creche Committee requested that the creche be allowed from December 17 to be removed "as soon as possible after the New Year." (Stip. 9(b)). The request in 1982 by the Creche Committee was the same except that the requested beginning date was December 16. The pending application by the Creche Committee for 1983 is "for the 1983 Christmas Season." Put into historical context, we construe this request to be for a period of about two weeks.

The Citizens Group application for 1982, which was denied, sought to display the creche from December 18 to December 26, or about nine days. The Citizens Group's pending request for 1983 is exactly the same except that the proposed starting date is December 17, and so is for about ten days. Although it appears that such details were never communicated to the board, the Citizens Group's heretofore never displayed creche is significantly smaller than the Creche Committee's (the figures in the nativity scene are only twelve inches high, although there are more of them, and the total area of the scene occupies only three feet across), and the Citizens Group would propose to display a larger sign indicating the Village's lack of endorsement of the creche than has the Creche Committee. McCreary dep. at 28–31, 40–41.

As a final matter, we note that creches are currently displayed during the Christmas season outside of homes and churches in Scarsdale, and that there is no indication that either members of the community or the Village have ever expressed opposition to such displays.

## II DISCUSSION

At the outset we address plaintiffs' free exercise claims. Only the Citizens Group has pressed these claims, and we find that they both do not describe the crux of the alleged wrong and otherwise are without merit. "To demonstrate an infringement of ... free exercise rights, an individual must show 'the coercive effect of the [state] enactment as it operates against him in the *practice* of his religion.'" *Brandon v. Board of Education,* 635 F.2d 971, 976 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981) (quoting *Abington School District v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963)) (emphasis added). To evaluate the coercive effect on the practice of religion, the court should "inquire into the relative importance of a particular religious ritual and the degree to which exercise of that practice is infringed by government action." *Id.* Governmental acts or policies forcing individuals "to choose [for example] between neglecting their religious obligations and rendering themselves liable for criminal sanctions or ineligible for state benefits" are particularly deplored. *Id.* at 977. In finding that plaintiffs' free exercise claims are insubstantial, we are persuaded by the following. First, plaintiffs have admitted that displaying a creche is not mandated by their religious beliefs. Butler dep. at 62; Curran dep. at 41. Second, plaintiffs have not on this record shown that displaying a creche on *public* property has *any* significance to their following the dictates of their religion. Third, the record is clear that plaintiffs may display creches on private property in Scarsdale. Fourth, and in sum, there is no evidence in this case that plaintiffs are being penalized for acting in accordance with their religious beliefs, thus forcing them to choose between so acting, and incurring the penalty, or not acting and avoiding it. *See generally Brandon v. Board of Education, supra,* at 977–78.

What we do find solidly implicated in this case is the question of whether plaintiffs have been impermissibly denied access to Boniface Circle in order to exercise their right, guaranteed by the Free Speech Clause of the First Amendment, to *express* their religious views.

■ In assessing whether a free speech right of access to public property has been impermissibly denied,[5] the court must make an initial determination as to the nature of the property involved. This is because, as the Supreme Court recently explained, "The existence of a right of access to public property [to engage in speech] and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Education Association v. Perry Local Educators' Association,* — U.S. —, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). In *Perry* the Court identified three "categories" of public property relevant to the inquiry of whether a denial of access is valid, and also articulated the corresponding standards for evaluating such denials. The first category of public property consists of "places which by long tradition or by government fiat have been devoted to assembly and debate." *Id.*

> At one end of the spectrum are streets and parks which 'have immemorially been held in trust for use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'

*Id.* at 954–55 (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). With regard to these "quintessential public forums ... the state [may] enforce a content-based exclusion [only if] it ... show[s] that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve

that end." *Id.* at 955. "The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

■ The second category of property relevant to assessing denials of access for speech purposes comprehends those places "which the state has opened for use by the public as a place for expressive activity." *Id.* "Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* This type of public forum "may be created for a limited purpose such as use by certain groups, *e.g., Widmar v. Vincent,* 454 U.S. 263 [102 S.Ct. 269, 70 L.Ed.2d 440] (1981) (student groups), or for the discussion of certain subjects, *e.g., City of Madison Joint School District v. Wisconsin Public Employment Relations Comm'n,* 429 U.S. 167 [97 S.Ct. 421, 50 L.Ed.2d 376] (1976) (school board business)." *Id.* at 955 n. 7.

■ The final type of public property relevant to free speech access analysis consists of "property which is not by tradition or designation a forum for public communication." *Id.* at 955. Such property might include the land on which a jail sits, *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), a military base, *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), or, as in the *Perry* case itself, internal school mailboxes. With respect to this category of property "the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials op-

---

5. The First Amendment, applicable to the states through the Fourteenth, provides "Congress shall make no law ... abridging the freedom of speech." Defendants have conceded "that a symbol for First Amendment purposes is a form of 'speech'" tr. at 49, and in fact they stress that

a symbol is a "shortcut from mind to mind." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943). Thus, there is no dispute here that an application to "speak" from public property was denied.

pose the speaker's view." *Perry, supra,* 103 S.Ct., at 955.

Apparently with this analytical framework in mind, defendants raise by way of their first proposed defense what we consider to be the threshold issues in this case. Defendants take the position that their denial of plaintiffs' applications to display a creche did not violate plaintiffs' free speech rights because "Boniface Circle is not a public forum; it is a small piece of land reserved by the Village for solemn commemorative occasions connected with the war memorial. The creche display, moreover, is inconsistent with the dedicated purpose of Boniface Circle." Def. Pre-trial Mem. at 25. The defendants elsewhere characterize Boniface Circle as a place exclusively for "patriotic reflection." *Id.* at 39.

 Turning to the facts before us, we are unable to agree with defendants' characterizations of the property in issue and instead conclude that, like most "parks," [6] Boniface Circle is a traditional public forum falling into the first category of public property identified in *Perry*. We reach this conclusion principally because 1) the Village has never shown an inclination to legally establish or even describe Boniface Circle as anything other than a park of the kind that is traditionally dedicated to First Amendment activities, and 2) the Village's pattern of granting and denying access to Boniface Circle belies the conclusion that it is either a limited public forum or no public forum at all. With regard to the first point, Boniface Circle was deeded to the Village in 1931 "for PARK PURPOSES ONLY." (Ex. 1) (uppercase in original). No qualifications as to the type of park Boniface Circle was to be were set forth in the granting instrument and, indeed, the instrument provided that the land was to revert should it ever cease to be used "as a park or open space." *Id.* When the Village determined to create the war memorial in 1947, there was no expressed intention to transform *Boniface Circle* into a war memorial. Rather, the war memorial was to be "located *in the park* at Boniface Circle." (Ex. 70) (Emphasis added). The trustees' resolution establishing the memorial instructed that it was only to occupy "such part of the public land in Boniface Circle as is necessary for the accommodation ... of a monument" (Ex. 73), and it is admitted that the memorial which was approved occupies only one-sixth of the public land. The Village has not subsequently attempted by way of some official act or proclamation to transform the nonoccupied part of Boniface Circle into a war memorial, and "[t]raditional public forum property will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *United States v. Grace,* — U.S. ——, 103 S.Ct. 1702, 1709, 75 L.Ed.2d 736 (1983).

With regard to the second point, we note the following. First, while it is true that over the years most applications for access to Boniface Circle have been denied [7] and applicants have been referred to other public parks, it appears that only once in the span of decades since the memorial was built was the stated reason that Boniface Circle was dedicated to war memorialization. On that occasion the Village Manager stated that "Boniface Circle is a War Memorial and is *mainly* used for memorial occasions and services" (denial of access for high school literary magazine fundraiser) (Stip. 92, Ex. 100) (emphasis added). On the other occasions when access was denied, the stated reasons were "because of shopping, parking, traffic, etc." (denial of access for American Field Service carnival) (Stip. 79, Ex. 86), and because an alternative site "might be a safer place" for the

---

**6.** Parks are generally "considered, without more, to be 'public forums.'" *United States v. Grace,* — U.S. ——, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983).

**7.** It is also true that there have been few applications for First Amendment access to Boniface Circle, probably because the park is small and would not easily accommodate uses to which other Scarsdale parks have been put.

proposed activity (alternative site approved for Girl Scout baked goods sale) (Stip. 81, Ex. 89). On all other occasions when access was denied, no reason for the denial was given.[8] Thus, while it does appear that the Village has been reluctant to allow speech and assembly on Boniface Circle, the denials of access just as easily support the conclusion that the reason for this reluctance was unrelated to the war memorial as they do that it was related. *See also* Tooley dep. at 186 (lending support to this conclusion).

The approvals of access demonstrate that Boniface Circle's status as a forum only for patriotic or solemn commemorative occasions was at best a sometimes thing. In addition to the Fourth of July and Memorial Day celebrations,[9] the Village has permitted access to Boniface Circle "for a carnival in connection with the American Field Service Work Day" (Stip. 78, Ex. 87), and as the site for launching the "Community Fund Drive" (Stip. 87, Ex. 95). On the latter occasion, the Community Fund was permitted "to station a facsimile of a rocketship in the vicinity of the flag pole on Boniface Circle and to release a helium filled balloon from the nose of said rocketship." *Id.* Boniface Circle has also for many years been the site of Christmas celebrations. The Town Club has been allowed to sponsor its Christmas Carol Sing at Boniface Circle on numerous occasions with an official of the Village welcoming the carolers in his or her official capacity (Stip. 58, 60). On a number of occasions the Village provided an amplification system or platforms for the carolers' use (Stip. 58), and the 1982 Christmas observances like some earlier years featured the arrival of Santa Claus on a Village-owned fire truck (Stip. 60). Every year, apparently going a long way back, the Chamber of Commerce has been "permitted access to and use of Boniface Circle for the purpose of installing and displaying Christmas ornaments" (Stip. 57). And, of course, for twenty-four years, the Village authorized the placement of a creche at Boniface Circle. While defendants argue that the creche "is inconsistent with the dedicated purpose of Boniface Circle," they make no attempt to explain why the other authorized uses are consistent. In any case, we see no reason to conclude that the singing of "Frosty the Snowman," "O Little Town of Bethlehem," or "Hanukah" (Stip. 60, Ex. 80), the erection of platforms and an amplification system, or several of the other permitted uses of Boniface Circle are any more consistent with solemn, patriotic reflection or war memorialization than is a mute, barely illuminated nativity scene. Most importantly, over the twenty-six years that the propriety of placing a creche at Boniface Circle was discussed, or on any of the occasions when other uses of Boniface Circle were allowed, there is no evidence that the Village Board of Trustees ever considered whether the proposed use would be inconsistent with what defendants assert is the "dedicated purpose of Boniface Circle."[10] In sum, on the record

---

**8.** Defendants point out that one applicant, the American Red Cross, sought permission to erect a four foot by four foot red wooden cross at Boniface Circle and was turned down because "it would set a precedent and requests from similar organizations could not reasonably be denied" (Stip. 73, Ex. 84). This does not, of course, tell us *why* the Village was reluctant to set a precedent and since the Red Cross denial came at a time (1958) when display of the creche was already being permitted, it is not obvious that the Village's concern was to reserve Boniface Circle for patriotic activities. Indeed, an argument can be made that a Red Cross symbol, unlike a creche, is consistent with the theme of patriotism. In any event, it seems just as likely that the Village had for example, an aesthetic concern in mind and was improperly

hoping to avoid the problem of having to develop valid time, place or manner restrictions to regulate future uses.

**9.** The record discloses that, with the exception of 1961, Fourth of July celebrations in the Village have occurred outside of Boniface Circle (Stip. 65, 70). Memorial Day celebrations have typically begun at Boniface Circle, where a wreath has been placed at the war memorial and a prayer said by a member of the clergy, who varies from year to year. A parade outside of Boniface Circle then has followed (Stip. 64).

**10.** In twenty-five years of board discussions, the only reference we have found which seems to take note of the war memorial while offering an opinion on the propriety of allowing the creche

before us, we are unable to conclude that the Village of Scarsdale "consciously has limited access," *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974), in a way which would warrant a finding that Boniface Circle is either a limited public forum or not a public forum at all. To the extent that it has allowed at least some access to what is by all description and appearance the kind of public property traditionally viewed as being "immemorially ... held ... for purposes of assembly" and speech, *Hague v. C.I.O.,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed.2d 1423 (1939), we find that Boniface Circle is a public forum. To the extent that the Village has *expressed* little concern for protecting Boniface Circle's alleged purpose, and otherwise has *acted* inconsistently toward it, *cf. Niemotko v. Maryland,* 340 U.S. 268, 273, 71 S.Ct. 325, 328, 95 L.Ed. 267 (1951) (manner restriction should not be credited as legitimate where officials act inconsistently toward it), we conclude that the forum is not "limited" within the meaning of *Perry* and the cases it cites. It may well be that a village can dedicate property solely for the pronouncement of patriotic views. *See* L. Tribe, *American Constitutional Law* § 12–4 at 590. We hold only that this village has failed to do so in any legally cognizable way.[11]

Since plaintiffs were denied access to a traditional public forum, we must now evaluate the denial to determine whether it stemmed from a content-neutral time, place or manner restriction, or was content-based. We conclude the denial was content-based for two reasons. First, and most important, debate by Village trustees and other officials as to whether a creche should be allowed at Boniface Circle has historically always focused on the religious

message the creche was thought to express. Thus, the perennial concern expressed was always that a *religious* symbol would be placed on "public" or "village" property. Whether the juxtaposition of religious symbolism and public land was thought to violate the Establishment Clause or was merely thought to generate discord in the community, the concern was always the religiosity of the symbol and not, for example, whether the creche, as a three dimensional structure, would disrupt pedestrian traffic, or, as defendants imply, would detract from the "calm, tranquility, and ... reverence," *Washington Free Community, Inc. v. Wilson,* 334 F.Supp. 77, 82 (D.D.C.1971), *aff'd,* 484 F.2d 1078 (D.C.Cir.1973), the Village purportedly seeks to maintain at Boniface Circle. (*See* Ex. 8, 9, 19–28). For this reason we think the fact that plaintiffs' applied for access only to Boniface Circle and not to some other park defendants suggest might have been more appropriate, is of no significance. The record makes clear that the historical concern, and by 1981 the reason for denying access, derived from a feeling that because the symbol was religious it should not be on *any* public land.

The second reason for finding that the denial was content-based is that all other applicants who, like plaintiffs, applied only for access to Boniface Circle were referred to other Village-owned property when their applications to Boniface Circle were denied (*see* Stip. 81, 87, 92 and Ex. 89, 95, 100). Relatedly, the Village has freely granted access to other parks for the erection of symbols and other three dimensional objects (*see, e.g.,* Stip. 73, 74, 75, 86, 87 and Ex. 84, 85, 94), and the Village had reason to know that plaintiffs might have been willing to accept other public property for

---

is one sentence, apparently spontaneous remark by Trustee Gordon in 1976. The trustee stated in support of allowing the creche that he did not think Boniface Circle with its war memorial was an "entirely improper" location (Ex. 22).

**11.** An argument that Boniface Circle was closed as a public forum, or became a limited public

forum, simultaneous to the board's decision to bar the creche in 1981 would not be credible for two reasons. First, the Village continued to permit caroling and other Christmas activities in Boniface Circle in 1981 and 1982. Second, there is no evidence in the record that the Village board intended to do this.

erection of their creche.[12] While these facts are revealing, we think they simply underscore what an examination of the debate on the creche issue by Village officials independently makes certain: the denial was content-based. We note finally that the denial could not be upheld as a time, place or manner restriction even if it were content-neutral because it was not issued pursuant to narrowly tailored regulations.[13] *See Neimotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951).

Our final inquiry, then, is whether the content-based denial of access to public land was "necessary to serve a compelling state interest." *Perry Education Association, supra,* 103 S.Ct., at 955. Defendants argue the denial was necessary to serve a compelling state interest because to allow the erection of the creche on public property would violate the Establishment Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, which dictates in general terms that there be no "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). Because we find that allowance of the creche would contravene the Establishment Clause, we agree with defendants that the denial was proper and necessary.

We have no difficulty in finding that the creche is, in essence, a religious symbol. It depicts the birth of Jesus Christ, an event which has obvious and profound religious importance to adherents of Christian faiths. Plaintiffs, while asserting that the creche also imparts secular messages such as peace and goodwill, do not contend otherwise. The Creche Committee's complaint concedes the creche is a "religious symbol," Creche Comm. Complaint ¶ 18, and the Citizens Group's complaint admits that "the purpose of the display ... was to celebrate and express religious convictions." Citizens Group Complaint ¶ 16. Indeed, the latter complaint suggests that a goal of displaying the creche at Boniface Circle was to give a more decidedly religious cast to the Village's celebration of Christmas. The relevant portion states:

> The plaintiffs also represent ... that among the purposes of the display of the Creche are · their desires to join in the Village's celebration of "Christmas" by giving recognition to the birth of Jesus Christ, the occasion and namesake of the holiday, and to celebrate and express religious convictions.

*Id* at ¶ 18. *See also* Ex. 3 (original application to put creche at Boniface Circle because creche symbolizes "the real significance of Christmas Time".)

Conceding the religiousness of the creche, plaintiffs argue that the Establishment Clause is not implicated in this case because the Village's mere allowance of access to a public forum for the dissemination of religious views does not constitute sponsorship or support of religious activi-

---

**12.** One of the options the Village considered in dealing with the creche problem was to designate part of "Chase Park" (convenient to Boniface Circle) as "Heritage Plaza." The Heritage Plaza concept was to create a forum for religious, patriotic, ethnic and other social activities by transferring Village-owned land to a private entity. The Creche Committee stated it was in favor of the proposal and, in particular, approved "of displaying the creche at Chase Park because it is centrally located and accessible to pedestrians." (Stip. 34). Thus, the Village was on notice that, even without creating a Heritage Plaza, the Creche Committee might have been willing to display the Creche at Chase Park. The Village also had reason to know that "Depot Plaza" would have been an acceptable alternative site. *See* Curran dep. at 8–10.

**13.** This not to say that content-neutral time, place or manner restrictions might not have been developed which could have justified the denial. *See, e.g., Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) ("The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable'"). Assuming the Village could develop valid time, place and manner regulations, having the effect of barring the erection of symbols in Scarsdale's parks, it is clear, of course, that such restrictions could not be tailored to bar only the erection of religious symbols. Content-neutrality would require that the Community Fund Rocketship, the Red Cross cross and likely any other three-dimensional object would also be prohibited.

ty.[14] We find that the resolution of this issue depends on whether *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1982) is directly controlling.

In *Widmar*, the University of Missouri had encouraged student groups to use its facilities to conduct meetings. In so doing, the Court found, the university had created a limited public forum and could not, without "a compelling state interest," bar groups from using its facilities because of the content of speakers' views. *Id.* at 270, 102 S.Ct. at 274. Like defendants here, the university argued that its exclusion of religious groups did serve a compelling state interest because to allow them access would violate the Establishment Clause. The Court agreed that avoiding an Establishment Clause violation would constitute a compelling state interest, *id.* at 271, 102 S.Ct. at 275, but applying the familiar three-prong test of *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) for determining Establishment Clause infractions [15] the Court found that the Establishment Clause did not justify the exclusion. First, the Court held, allowing access to a public forum in a nondiscriminatory way would constitute a "secular purpose," thus satisfying the first prong of *Lemon*. *Id.* at 271–72 & n. 10, 102 S.Ct. at 275 & n. 10. Second, the Court found no "entanglement" with religion since "the University would risk greater 'entanglement' by attempting to enforce its exclusion" insofar as it would have "to determine which words and activities" fell within the proscribed classification of speech. *Id.* at 272 n. 11, 102 S.Ct. at 275 n. 11. Finally, the Court concluded, by opening its forum "to all forms of discourse," the University would not be "advancing"

religion. *Id.* at 273, 102 S.Ct. at 276. With respect to the advancement of religion, the Court found "that any religious benefits of an open forum would be 'incidental,'" and it noted two factors which it deemed particularly persuasive. *Id.* at 274, 102 S.Ct. at 276. The first was that an open forum for discourse did "not confer any imprimatur of State approval on religious sects or practices." *Id.* The second was that because "a broad class of nonreligious as well as religious speakers" numbering "over 100" were represented among the student groups, the open forum policy had an equally broad and secular effect. *Id.* The Court summed up by observing that "[i]f the Establishment Clause barred the extension of general benefits to religious groups, 'a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair.'" *Id.* at 274–75, 102 S.Ct. at 277 (citations omitted).

In assessing the proper precedential weight *Widmar* should be read to have in the instant case we are mindful that

> There are always risks in treating criteria discussed by the Court from time to time as "tests" in any limiting sense of that term. Constitutional adjudication does not lend itself to the absolutes of the physical sciences or mathematics. The standards should rather be viewed as guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired.

*Tilton v. Richardson*, 403 U.S. 672, 678, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971). Accordingly, it has been noted that the delicate task of construing Free Exercise and Establishment Clause law requires close attention to the "sensitive issues of fact, and ... to the particular circumstanc-

---

**14.** Plaintiffs make no argument, for example, that the creche is permissible because it is part of a larger celebration which is secular in nature, *cf. Donnelly v. Lynch*, 525 F.Supp. 1150 (D.R.I.1981), *aff'd*, 691 F.2d 1029 (1st Cir.1982), *cert. granted*, — U.S. —, 103 S.Ct. 1766, 76 L.Ed.2d 340 (1983), or because Christmas may be celebrated with state support even in religious ways. *Cf. Donnelly v. Lynch*, 691 F.2d 1029, 1037–39 (1st Cir.1982) (Campbell, J., dis-

senting), *cert. granted*, — U.S. —, 103 S.Ct. 1766, 76 L.Ed.2d 340 (1982).

**15.** Under *Lemon*, a governmental policy will not offend the Establishment Clause if it can pass a three-pronged test: "First, the [policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the [policy] must not foster 'an excessive government entanglement with religion.'"

es" involved. *Brandon v. Board of Education*, 635 F.2d 971, 973 (2d Cir.1980), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981). *Widmar* itself cautioned that its holding derived from a particular factual "context," *Widmar v. Vincent*, 454 U.S. at 273, 102 S.Ct. at 276, and was limited "to the case before us." *Id.* at 276, 102 S.Ct. at 277. The *Widmar* opinion concludes by observing, "The basis for our decision is narrow." *Id.* at 277, 102 S.Ct. at 278. Our job then, is to make careful observations as to the similarities and differences between the facts of *Widmar* and those before us.

In holding that the Establishment Clause would not be violated on the facts before it, the *Widmar* Court addressed a factual situation in which 1) religious speech was to take place at "group[ ] meeting[s]" and consist of "discourse" by "speakers," *id.* at 273, 274 & n. 14, 102 S.Ct. at 276, 277 & n. 14; and 2) the forum in which the speech would occur would be university facilities, presumably classrooms and meeting rooms, so that the community within which the forum existed was comprised of "young adults ... able to appreciate that the University's policy is one of neutrality toward religion." *Id.* at 274 n. 14, 102 S.Ct. at 276 n. 14. In contrast, the instant case involves 1) religious speech in the form of a physical structure which for ten to fourteen days is to convey its adherents' message, twenty-four hours a day, even in their absence, and 2) is to do so in a public park visited by persons "of all stripes," clearly including children.[16] With these factual differences in mind, we conclude that *Widmar* is controlling on the "purpose" prong of the *Lemon* test, is somewhat controlling on the "entanglement" prong, and is not controlling on the "primary effect of advancement" prong.

■ *Widmar* makes clear that in a case in which access to a public forum is sought for the purpose of engaging in religious speech, the purpose which should be attributed to the state in allowing the speech is the secular one of providing equal access to the public forum. *Widmar v. Vincent*, 454 U.S. at 272–73 & n. 10, 102 S.Ct. at 275–76 & n. 10. Accordingly we find that allowing the creche would not violate the Establishment Clause for want of a secular purpose.

The entanglement issues are more complex than in *Widmar*, but they do not tilt so clearly in one direction that allowance of the creche could be found to violate the Establishment Clause on this ground alone. What was said in *Widmar*, that enforcing the exclusion would involve some entanglement in the sphere of religion, is equally true here. In order for the Village to bar religious symbols from public property, the Village would have to determine which symbols were "religious." On the other hand, insofar as governments already must make such determinations to keep religious signs and symbols off public buildings, *see, e.g., Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam); *Goldstein v. Fire Department of Suffern*, 559 F.Supp. 1389 (S.D.N.Y.1983); *Fox v. City of Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978), to avoid spending money on their creation or display, *see, e.g., Gilfillan v. City of Philadelphia*, 637 F.2d 924 (3d Cir.1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981); *Donnelly v. Lynch*, 525 F.Supp. 1150 (D.R.I.1981), *aff'd*, 691 F.2d 1029 (1st Cir.1982), *cert. granted*, ── U.S. ──, 103 S.Ct. 1766, 76 L.Ed.2d 340 (1983), and to avoid their permanent placement on public land, *see, e.g., ACLU v. Rabun County Chamber of Commerce*,

---

**16.** Although there is little direct testimony on this point, the record makes plain that children have viewed the creche at Boniface Circle. First Boniface Circle's proximity to the business district filled with stores and professional offices, makes plain children would have opportunities to view the creche. A number of letters regarding the creche were written by people who said they grew up viewing it as a Village "tradition" (*see, e.g.,* Ex. 82), and some letters expressing a view, were written by children themselves, or by "families." One letter printed in the *Scarsdale Inquirer* in 1976 stated, "Although I'm only 13 I feel the creche, a deeply religious symbol does not promote 'good will.' I am Jewish: my menorah lights will burn in my home. I like to think Boniface Circle belongs to all Scarsdalians." (Ex. 62).

510 F.Supp. 886 (N.D.Ga.1981), *aff'd,* 678 F.2d 1379 (11th Cir.1982), *op. modified,* 698 F.2d 1098 (11th Cir.1983); *Lowe v. City of Eugene,* 254 Or. 518, 451 P.2d 117, *op. withdrawn,* 254 Or. 518, 459 P.2d 222, *rehearing denied,* 254 Or. 518, 463 P.2d 360 (1969), *vacated,* 276 Or. 1007, 558 P.2d 338 (1976), *cert. denied,* 397 U.S. 1042, 90 S.Ct. 1366, 25 L.Ed.2d 654 (1970), having to make such determinations with regard to shorter term displays in public forums does not seem to add much to their burden.

If a free speech right to display religious symbols in public parks were judicially recognized—a fact not assumed in the Village of Scarsdale—and applications to display religious symbols thereby increased, we think the type of entanglement associated with fairly making available scarce time and space could be a problem. Neutral time, place and manner regulations would help, but the situation would appear ripe for "lurking doubts about favoritism." *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974).

■ The record does indicate the existence of a "divisive political potential" over the creche issue, another aspect of entanglement. *Lemon v. Kurtzman,* 403 U.S. 602, 622, 91 S.Ct. 2105, 2115, 29 L.Ed.2d 745 (1971). Clearly the issue has created division in the community, and it is also true that some candidates for the board have run, with little success, taking stands on the creche. However, a result in this lawsuit, one way or the other, would seemingly leave little to future political debate, and accordingly we do not see the divisiveness element as contributing much to entanglement. In sum, while allowing the creche does generate some entanglement potential, this potential is not enough, in our opinion, to constitute an Establishment Clause violation.

It is with respect to the "primary effect of advancing religion" prong of *Lemon* that the instant case differs most from *Widmar.* As noted, *Widmar* found no improper advancement of religion when the role of state authority was limited to making its property available in a nondiscriminatory way so that students could gather to exchange and express religious ideas. Other cases similarly support the conclusion that where assembly and religious expression are contemporaneous, merely allowing speakers to speak from public property does not have the primary effect of advancing religion. *See, e.g., Fowler v. Rhode Island,* 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); *Brandon v. Board of Education,* 635 F.2d 971, 978 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981); *O'Hair v. Andrus,* 613 F.2d 931, 934–35 (D.C.Cir.1979). Thus, if plaintiffs had sought to hold a religious rally, conduct a sermon, leaflet, or otherwise personally engage in expressive conduct, we would have little doubt that the proposed activity would, under the protection of the Free Speech Clause, run free and clear of the Establishment Clause.

■ But this conclusion does not lead inexorably to the additional conclusion that *all* forms of religious expression will be entitled to the same protection or will be held just as permissible as comparable secular forms of speech might be.[17] Although we are aware of no cases which squarely address this issue, we think it a sound proposition that, as is true with any other religious activity, to the extent religious speech sufficiently relies to effect its purpose on the "prestige, power and influence of [the state]," *Abington School District v. Schempp,* 374 U.S. 203, 307, 83 S.Ct. 1560,

---

17. We have little doubt, for example, that the Village could permit the Community Fund rocketship to sit on Boniface Circle forever, if the Village so wished. On the other hand, we would almost certainly have to reach a different conclusion if it wanted to permit a permanent altar of some kind. *Cf. Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (conversion of property paid for by government for secular purposes permissible, but conversion for religious purposes violates Establishment Clause). *See also, ACLU v. Rabun County Chamber of Commerce,* 510 F.Supp. 886 (N.D.Ga.1981), *aff'd,* 678 F.2d 1379 (11th Cir.1982).

1563, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring), it will implicate the state in the advancement of religion in violation of the Establishment Clause. Accordingly, we must decide if the manner chosen by the plaintiffs to convey their religious message sufficiently relies on the "prestige, power and influence" of the Village to constitute an impermissible state advancement of religion.

To decide this question, we consider that the "primary effect of advancing religion" prong of Establishment Clause analysis is concerned with state action which has "the direct and immediate effect of advancing religion," *Committee for Public Education v. Nyquist*, 413 U.S. 756, 783–84 n. 39, 93 S.Ct. 2955, 2970–71 n. 39, 37 L.Ed.2d 948 (1973), and is likewise unconcerned with effects which provide only "'indirect,' 'remote,' or 'incidental' benefit." *Id.* at 771, 93 S.Ct. at 2965. *See Widmar v. Vincent*, 454 U.S. at 273, 102 S.Ct. at 276. On the other hand, government need spend no money to advance religion in violation of the Establishment Clause. *See Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam). The "cases recognize that government sponsorship of religious beliefs can occur in ways far more subtle than endowing state churches or mandating acceptance of certain religious rites or tenets." *Donnelly v. Lynch*, 525 F.Supp. 1150, 1175 (D.R.I.1981), *aff'd*, 691 F.2d 1029 (1st Cir.1982), *cert. granted*, — U.S. —, 103 S.Ct. 1766, 76 L.Ed.2d 340 (1983). Indeed, "the mere *appearance* of a joint exercise of ... authority by Church and State provides a significant symbolic benefit to religion" and therefore may impermissibly advance religion. *Larkin v. Grendel's Den, Inc.*, — U.S. —, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982) (em-

phasis added). *See also Stone v. Graham*, 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980) (per curiam); *Brandon v. Board of Education*, 635 F.2d 971, 979 (2d Cir.1980), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981). Thus, the State must make sure that its "efforts to perform a secular task ... [do] not lead it into such an intimate relationship with religious authority that it appears ... to be sponsoring that authority." *Roemer v. Maryland Public Works Board*, 426 U.S. 736, 747–48, 96 S.Ct. 2337, 2345–46, 49 L.Ed.2d 179 (1976).

Guided by these principles, we find that allowing plaintiffs' creche to stand for ten or so days at Boniface Circle would have the direct and immediate effect of advancing religion in two related ways. First, in contrast to cases like *Widmar* where speech derives from the simultaneous efforts and actions of those who have gathered to engage in it, when a symbol is placed on public land the land performs an added and enhanced *function*. No longer is the land just a place from which a message can be proclaimed; when a symbol is left on public land the land actually becomes the message bearer. This means that public resources are substituted for personal conduct as a way of generating the speech. Thus, for example, even if the persons on whose behalf the symbol speaks its religious message were to eschew the cold of Scarsdale and choose instead to winter down south, the message would still be proclaimed because public property would be there to carry that message.[18] Ours is not a case, therefore, where "government ... lets each [religious group] flourish according to the zeal of its adherents," *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954

---

**18.** We need not assume the most egregious case to perceive the validity of the point. Undoubtedly, during a continuous ten day period there would be many occasions on which the persons on whose behalf a religious symbol speaks would be at home, at work or otherwise occupied. The message, of course, would be proclaimed nevertheless. This reality is particularly laid bare by the concession of one of the

individual plaintiffs that during his six or seven years as a resident of Scarsdale, he never once made a trip downtown just to see the Village creche, and that he only noticed its presence in two or three of those years; this despite his "strong" and "deep" conviction that a creche be displayed at Boniface Circle. Butler dep. at 22–29, 90.

(1952); when public property becomes the message bearer, government allows religion to flourish in a way which bears no necessary relation to the zeal of its adherents. Thus, state resources are relied upon and used to advance religion in a way which "cannot realistically be termed simply accommodation." *Abington School District v. Schempp*, 374 U.S. 203, 307, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring).

The second way in which permitting the creche for ten days would advance religion is closely related. Because when a symbol is implanted on public land that land uniquely becomes the message bearer, and because, concomitantly, there are no persons present to whom the receiver of the religious message can attribute the speech, the possibility that those receiving the message will assume it is supported by the state is particularly present.

The record discloses in two ways that the appearance of state support, brought about when symbols are erected and left on public property, is an actual and not merely a theoretical problem. The first relates to the fact that other forms of religious expression, although occurring on public property, have not, in stark contrast to the creche display, generated much if any complaint. The Village, for example, has routinely and for many years allowed local churches to hold picnics in its parks and block parties in its streets (Stip. 72). It has permitted Wayside Cottage, a publicly owned historical building, to be used for religious services and celebrations (Stip. 67). It has allowed its streets and parks to be used to publicize and raise money for religiously sponsored and affiliated philanthropies (Stip. 85, 96–97). And it has allowed members of the clergy to say prayers and give benedictions on public property at Memorial Day gatherings and at the annual Christmas Carol Sing (Stip. 64, 79). Unlike the creche, none of these uses has

generated letters protesting that the Village's streets and parks belong to "all of the people," nor forced the board to ponder the question of whether its decision to allow the use would *in fact* be supporting religion. The record suggests that, in contrast to public gathering uses, people have objected to the creche precisely because an aura of Village approval has adhered to it.[19] Removing this aura of Village approval was the primary concern of the members of Scarsdale's clergy who offered their church properties on an annually rotating basis for display of the creche.

Indeed, cultivating an aura of Village approval is, in our view, one of the factors fueling plaintiffs' desire to have the creche on public property. This is the second way in which the record suggests that the appearance issue is more concrete than theoretical. The Creche Committee has conceded, through its chairperson, that among its reasons for wishing to display the creche at Boniface Circle is a desire to enhance the creche's merely religious message with an "ecumenical aspect." *See* Curran dep. at 54–56. We have already noted that, on the record before us, this reason appears to be a dominant one. Imbuing the creche with an ecumenical appearance or the appearance that the symbol speaks a "world-wide, general, or universal" message, *Webster's Third New International Dictionary* (unabridged ed. 1971), would seem to occur *only* if Village land—the property of "all the people"—is in fact linked in the receiver's mind with the message, since there is nothing inherently ecumenical about the creche standing alone. The likelihood of a mental linkage between the message and the property owner's identity is the stated reason why the Creche Committee believes that the "ecumenical aspect" of the creche's message would be destroyed if the creche were displayed on church property. Curran dep. at 54–56. However unsatisfactory the alternatives may be,[20] the problem

---

**19.** People have *defended* it for exactly the same reason, arguing that the creche should be allowed to remain because it is a "Village" or "Scarsdale" tradition.

**20.** Those who believe in the religious message of the creche could gather together on public property to proclaim it, have everyone who agrees with the message personally display creches on

with attempting to create an "ecumenical aspect" by placing the creche on public property is that the creche does *not* speak for all the people. More fundamentally, since allowing the creche also permits it to gain the false appearance of speaking for all of Scarsdale's residents, allowing the creche advances religion in violation of the Establishment Clause. In contrast to *Widmar*, not only does there appear to be an "imprimatur of State approval" when the creche sits at Boniface Circle; plaintiffs' actually seek it.

We note, too, that factors militating against the appearance of state support in *Widmar*, are absent here. First the community viewing the creche includes children who cannot be counted on to "appreciate that the [Village's] policy is one of neutrality toward religion." *Widmar, supra*, 454 U.S. at 274 n. 14, 102 S.Ct. at 276 n. 14. Second, we cannot say on the record before us that "a broad class of nonreligious as well as religious" symbols, *id.* at 273, 102 S.Ct. at 276, will abound in Scarsdale's parks thus minimizing the appearance of state support. Symbols in public parks are relatively rare, and it appears that only one religious symbol has been offered for display in Scarsdale's parks for as far back as anyone can recall. Whether a decision squarely holding that such symbols are permissible would encourage other religious adherents to display symbols is not clear—the record indicates that many feel it is inappropriate to display religious symbols on public property for moral and theological reasons, and that some might be reluctant to erect displays out of fear of generating animosity toward their religion.[21] Ironically, though, while a multiplicity of religious symbols on public property might lessen the appearance of state support for any or all, it would seem to increase the dangers discussed above with

regard to public property performing a functional role as the message bearer, and would also increase the problems of entanglement. We note, finally, that even if privately funded and erected religious symbols became commonplace, the "lurking doubts" of state support would likely not be completely dispelled. History is simply too replete with examples of government impermissibly seeking to bolster religion through the erection of signs and symbols to permit it. *See, e.g., Stone v. Graham, supra; Gilfillan v. City of Philadelphia*, 637 F.2d 924 (3d Cir.1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981); *Goldstein v. Fire Department of Suffern*, 559 F.Supp. 1389 (S.D.N.Y.1983); *Donnelly v. Lynch*, 525 F.Supp. 1150 (D.R. I.1981), *aff'd*, 691 F.2d 1029 (1st Cir.1982), *cert. granted*, — U.S. —, 103 S.Ct. 1766, 76 L.Ed.2d 340 (1983); *ACLU v. Rabun County Chamber of Commerce*, 510 F.Supp. 886 (N.D.Ga.1981), *aff'd*, 678 F.2d 1379 (11th Cir.1982), *op. modified*, 698 F.2d 1098 (11th Cir.1983); *Fox v. City of Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978); *Lowe v. City of Eugene*, 254 Or. 518, 451 P.2d 117, *op. withdrawn*, 254 Or. 518, 459 P.2d 222, *rehearing denied*, 254 Or. 518, 463 P.2d 360 (1969), *vacated*, 276 Or. 1007, 558 P.2d 338 (1976), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1366, 25 L.Ed.2d 654 (1970).

■ The advancement problems are not cured by the placement of a sign next to the creche. First, a sign does not solve the problem of public land taking over the function of message bearer from adherents. Second, it is doubtful that a sign saying that a symbol has been "erected and maintained" by a private group will entirely eliminate the appearance of state support when public land is still the one visible thing to which the speech may be attrib-

---

their own property, or have all of their churches, as a number of Scarsdale churches now do, display a creche. Each of these alternatives would allow the message to be proclaimed in an ecumenical way. Moreover, each would ensure that the scope of the ecumenical expression would not, at the expense of nonbelievers, appear broader than in reality it is.

**21.** On this latter point, *see Fox v. City of Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663, 666 (1978) ("there may be complex and troubling reasons why residents who are non-Christian [will choose] not to seek 'equal recognition and aid' ").

uted. The Creche Committee was not sure that a sign would prevent its ecumenical message from being "destroyed" if the creche were displayed on church property, *see* Curran dep. at 56–57, and the record suggests, for reasons already stated, Scarsdalians continued to perceive that "aura of Village support" long after the Creche Committee began posting a sign in 1976. *Cf. Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam) (posting of notation under religious symbol did not avoid Establishment Clause violation).

We think, too, that if cases such as this were to turn on minutiae like the visibility or lack of ambiguity of disclaiming signs, *see Allen v. Morton*, 495 F.2d 65, 89 (D.C. Cir.1973) (Leventhal, J., concurring), the size or relative size of the symbol, the length of time for the display, or the potentially myriad other factors which possibly could be held to affect the outcome, the *courts* would become hopelessly entangled in the problem, and, perhaps more importantly, villages like Scarsdale would endlessly be in and out of court.

Acknowledging that "we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication," *Tilton v. Richardson*, 403 U.S. 672, 678, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971), we nevertheless look in this case of novel impression for a clear rule of decision which strikes at the "common sense of the matter." *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952). That rule, we think, is suggested by the approach former Mayor Stone took in making the obviously personally difficult decision to vote against the creche after having previously voted for it. The Mayor, a Christian, a non-lawyer, and someone who maintains a creche in her own home, Stone dep. at 48, was persuaded to vote against allowing the creche when she began to consider that private property was available for symbolic religious displays and that there was a difference between "a 'speaking' use" of public property for the dissemination of religious ideas and the erection of

symbols to effect such a purpose. In her words, the creche was different because "the placement of the Creche in the center of the village ... is more permanent, it is a solid seeable religious artifact ... and you see it there in the heart of Scarsdale on village property like the village is supporting it." *Id.* at 18–19.

We hold that because the creche would be erected 1) for a time period not essentially contemporaneous with assembly, 2) in a public park visited by persons of "all stripes," and 3) not as part of an event having an overriding secular effect, *compare Allen v. Morton*, 495 F.2d 65 (D.C. Cir.1973), and *Donnelly v. Lynch*, 525 F.Supp. 1150 (D.R.I.1981), *aff'd*, 691 F.2d 1029 (1st Cir.1982), *cert. granted*, —— U.S. ——, 103 S.Ct. 1766, 76 L.Ed.2d 340 (1983), it was proper for the Village to deny plaintiffs' applications in order to avoid contravening the Establishment Clause. Insofar as the Village's denials of access to plaintiffs have been consistent with and no broader than this holding, we also find that they have been sufficiently "narrow" to justify a denial of free speech access. *See Perry, supra*, 103 S.Ct. at 955. Were we to accept that displaying a creche on public property constituted a practice of plaintiffs' religion, we would reach the same conclusion with respect to their free exercise claims. The Creche Committee has not pressed its equal protection argument, but we think our holding is dispositive of that claim as well.

## CONCLUSION

■ It may be that the line we have drawn in this case could have been drawn through some slightly different point on the continuum of factual degrees. But we consider that "[t]he Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn." *Lemon v. Kurtzman*, 403 U.S. 602, 625, 91 S.Ct. 2105, 2117, 29 L.Ed.2d 745 (1971). The line

we have drawn allows persons with religious views unfettered freedom to come onto public forum property to *personally* speak those views. We also think it would give them the unimpeded right, subject of course to reasonable time, place and manner restrictions, to bring religious symbols with them. *See O'Hair v. Andrus,* 613 F.2d 931, 933 (D.C.Cir.1979) (papal mass in public park including display of "alter [sic] and other accouterments connected with the mass" did not violate Establishment Clause). Our holding leaves untouched the certain right, well practiced in Scarsdale, of persons with religious views to maintain symbols on private property around the clock and for as long as they wish. And, we think, it draws a boundary which does not question the right of religion to receive "general [governmental] benefits," *see Widmar v. Vincent,* 454 U.S. at 274, 102 S.Ct. at 277, but which does allow government not to be "joined" in the promotion of religion. Finally, our holding provides at least some degree of predictability for all concerned.

The judgment is for defendants in all respects.

SO ORDERED.