739 F.2d 716
 Kathleen S. McCREARY, David Drabkin, Ann F. Cawley, Angelina
J. Messenger, Edward R. Napolitano, Charles E. Butler, John
D. Hawkins, Nancy G. Steger, Richard Cacciato, Carol Ann
Pascal, Marty T. Thompson and Gregory De Sousa, Plaintiffs-Appellants,
v.
Jean STONE, Elisabeth M. Brown, Edward Falkenberg, Beatrice
K. Underweiser, The Board of Trustees of the
Village of Scarsdale, and The Village of
Scarsdale, Defendants-Appellees.
The SCARSDALE CRECHE COMMITTEE, Patricia Curran, Cynthia
Barsuhn, Grace Fellows, Doris Adler, Mary Tully,
Joan Mann and Maria Pedulla, Plaintiffs-
Appellants,
v.
The VILLAGE OF SCARSDALE and The Board of Trustees of the
Village of Scarsdale, Defendants-Appellees.
 No. 1071, Docket 83-9052.
 United States Court of Appeals,
Second Circuit.
 Argued April 18, 1984.
Decided June 21, 1984.
Certiorari Granted Oct. 15, 1984.
See 105 S.Ct. 291.
 
 Marvin E. Frankel, New York City (Kramer, Levin, Nessen, Kamin & Frankel, New York City; Steven E. Greenbaum, Thomas R. Newman, New York City, of counsel; Siff & Newman, New York City), for defendants-appellees.
 (Leslie K. Shedlin, New York City; Justin J. Finger, Jeffrey P. Sinensky, Ruti G. Teitel, New York City, of counsel), for Anti-Defamation League of B'nai B'rith as amicus curiae.
 Marvin Schwartz, New York City (Sara Goodman, New York City), for plaintiffs-appellants The Scarsdale Creche Committee, et al.
 Vincent K. Gilmore, Michael J. Murphy, New York City, for plaintiffs-appellants Kathleen McCreary, et al.
 Before MANSFIELD, PIERCE and PRATT, Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Southern District of New York, Charles E. Stewart, Jr., Judge, entered on December 15, 1983, holding that it was "proper" for defendant-appellee Village of Scarsdale ("Village" or "Scarsdale") to deny plaintiffs-appellants' applications to display a creche in a public park during the Christmas holiday season in order to avoid contravening the establishment clause of the first amendment. McCreary v. Stone, 575 F.Supp. 1112, 1133 (S.D.N.Y.1983). The district court's decision was rendered prior to the Supreme Court's decision in another creche case, Lynch v. Donnelly, --- U.S. ----, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Based upon the controlling precedents of Lynch and Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), we reverse and remand.
 
 BACKGROUND
 
 2
 In simplest terms, this appeal concerns applications by two groups to place a creche at Boniface Circle, a Village-owned park located in the center of the business district of Scarsdale, for a period of approximately two weeks during the Christmas holiday season. Plaintiffs-appellants in the first group, twelve in number, are mainly residents of Scarsdale. We will collectively refer to these plaintiffs and other residents who applied to display a creche in Scarsdale on December 7, 1982, as the "Citizens' Group." Plaintiffs-appellants in the second group, seven in number, are either residents of Scarsdale or have a "Scarsdale, N.Y." post office address. They are representatives of plaintiff-appellant The Scarsdale Creche Committee, which is a private unincorporated association of seven Catholic and Protestant churches; all of the churches are located in Scarsdale or have a "Scarsdale, N.Y." post office address. Each church contributes approximately twenty-five dollars annually to The Scarsdale Creche Committee to defray the costs of maintaining and displaying one of the subject creches herein. We will collectively refer to these local residents, the churches they represent and The Scarsdale Creche Committee as the "Creche Committee" or as the "Committee."
 
 
 3
 Scarsdale is a municipal corporation located in the County of Westchester, State of New York. Scarsdale's governing body is known as the Board of Trustees of Scarsdale (the "Board") and usually is elected under a political system known as the Non-Partisan system, in which the Citizens Party nominates candidates for trustees and mayor. The Board governs the affairs of Scarsdale's 17,000 religiously diverse residents.
 
 
 4
 Among the public properties under the jurisdiction, management and control of the Village and its Board are several parks and other public facilities located in Scarsdale; they include Wayside Cottage, Village Hall, the Scarsdale Public Library, Chase Road Park and Boniface Circle. There are eight "Rules and Regulations Governing Park and Recreation Facilities" that have been in effect in Scarsdale since 1979. These rules state, inter alia, that groups desiring use of parks should apply to the Superintendent of Parks, Recreation and Conservation; that groups given permission to use parks should leave them in a clean and orderly condition and will be held responsible for any damage; and that groups using park facilities may be required to obtain public liability insurance. There is no published statute, law, ordinance, rule or regulation in effect in Scarsdale that requires persons wishing to use Scarsdale's parks or other public properties first to apply for permission from the Board, and there are no published standards upon which the Board bases its decisions to grant or deny applicants permission to use Scarsdale's parks or other public properties. However, Village Code Section 4-1-2 states that "[n]o person shall interfere with, take or use any of the property of the Village without first obtaining the consent of the Village Manager."
 
 
 5
 It is undisputed that throughout the years covered by this litigation, Scarsdale, acting through its Board, usually granted requests for access to and use of its parks and public properties. Rather than issue a complete denial, on each occasion that it did not grant a specific request, the Board usually chose to approve access to and use of alternative public property. For example, in 1957, the Girl Scouts requested permission to conduct a baked goods sale at Boniface Circle. At the mayor's suggestion, the Board passed a resolution granting permission to the Girl Scouts to use Chase Road for its sale because the Board thought this public location was safer.
 
 
 6
 It is also undisputed that the Board has granted general use of its parks and public properties for purposes such as speechmaking, demonstrating, participating in silent vigils and distributing petitions and other communications. Similarly, the Board has been aware of numerous requests to erect displays on Village-owned property. For example, the Scott Room of the Scarsdale Public Library often has been used for the purpose of exhibiting and displaying articles of an artistic, scientific, literary, civic, cultural, educational or religious nature. Books, miniature military figures, rare stamps and Hanukkah menorahs are among the articles that groups have exhibited and displayed in the library.
 
 
 7
 Moreover, it is undisputed that Scarsdale has granted access to parks and public properties to groups associated with particular religions. For example, in recent years Scarsdale was aware that Wayside Cottage was the location of religious services by Congregation M'Vakshe Derekh and the Bahai Faith Group. The parties stipulated that the June 23, 1983, edition of the Scarsdale Inquirer reported that Congregation M'Vakshe Derekh was conducting its regular Sabbath services at Wayside Cottage. Wayside Cottage also has been used for a Catholic Mass, a Unitarian wedding ceremony, Bar Mitzvahs and religious services by the Bet Ami Conservative Synagogue. Further, in 1956, the Board granted permission to the Reconstructionist Synagogue of Westchester to use the Crossway Firehouse for the purpose of conducting worship services in September of that year.
 
 
 8
 Like innumerable local communities, Scarsdale celebrates several holidays during the course of any given year. The holiday that is the center of discussion herein is Christmas. Christmas and Scarsdale's parks and public properties intersect in several ways. For many years, including 1981 and 1982, Scarsdale permitted use of several streets located in the Heathcote, Central Business (which includes Boniface Circle) and Garth Road areas of the Village by the Scarsdale Chamber of Commerce for the purpose of installing and displaying Christmas lights and ornaments. Scarsdale allowed the Chamber of Commerce to display these lights on Village-owned utility poles for approximately one month each year, commencing on or about December 1. Scarsdale also permitted the members of the Chamber of Commerce to broadcast Christmas music in these areas during the time the Christmas lights and ornaments were displayed.
 
 
 9
 Additionally, for many years, including 1981 and 1982, Scarsdale permitted use of Boniface Circle by the Chamber of Commerce for the purpose of installing and displaying Christmas ornaments for approximately one month each year, commencing on or about December 1, on two lamp posts in Boniface Circle and on the lamp posts directly surrounding Boniface Circle.
 
 
 10
 In each of the years 1959, 1962 through 1965, and 1968 through 1971, the Village permitted the Town Club, a private group of Scarsdale residents to use Boniface Circle to celebrate Christmas through a Christmas Carol Sing. In 1958, the Town Club held the Carol Sing at Chase Road adjoining Boniface Circle; in 1960, at the public high school in Scarsdale; in 1967, at Chase Road Park. From 1972 through 1981, Scarsdale permitted use of the plaza outside the entrance to Village Hall, the seat of Scarsdale's local government, for the Carol Sing. Clergymen from local churches offered invocations and benedictions at the Carol Sing in 1959, 1960, 1969 and 1970. In some of the above years, Scarsdale provided Village-owned loudspeakers for use in connection with the Carol Sing, and in 1971, Scarsdale permitted use of platforms from the local high school as well. Also, in some of the above years, the mayor or a member of the Board, upon invitation, attended and welcomed carolers in his or her official capacity. Finally, in 1982, the Village permitted access to Boniface Circle for the Carol Sing. The repertoire of Christmas carols included "The First Noel," "Hark the Herald Angels Sing," "Oh Come All Ye Faithful," "Silent Night," "O Little Town of Bethlehem" and "We Three Kings."
 
 
 11
 Other examples of Scarsdale's Christmas involvement include allowing Village employees to erect, decorate and display Christmas trees in Village Hall. In 1982, Scarsdale allowed Village employees to install and display Village-owned Christmas lights on the large evergreen tree located in the center of Boniface Circle for approximately two and one-half weeks, and in 1981 and 1982, Scarsdale allowed the Arthur Manor Community Association to install and display Christmas lights and ornaments on a large evergreen tree owned by the Village at Davis Park.
 
 
 12
 The Scarsdale public property that is central to the dispute herein is Boniface Circle. Scarsdale originally acquired Boniface Circle from the Scarsdale Improvement Corporation in 1931. It is located in the center of the retail business district of the Village and encompasses approximately 3,257 square feet in an oval-shaped configuration. Located inside Boniface Circle is an evergreen tree, approximately thirty-feet tall, two benches, two lamp posts, dense hedges, a walkway and a flagpole at the southern end in an open grassy area. A memorial to the veterans of World War II, which was erected after Board approval in 1947, is located at the northern end of Boniface Circle.
 
 
 13
 Business and residential properties face Boniface Circle. Among the businesses are restaurants, clothing establishments and a sporting goods shop. Throughout the year, many people frequent Boniface Circle due to its location in the center of Scarsdale's business district.
 
 
 14
 Beginning in 1956, at the request of four Scarsdale churches, the Board granted permission to place a creche during the Christmas season at Boniface Circle. In 1957, several churches formed the Creche Committee for the purpose of commissioning the sculpting of a wood-carved creche that was to be displayed in Scarsdale during the Christmas season. The completed creche consists of a wooden frame approximately six-feet tall at its peak, dropping off on each end to about three and one-half feet. It is approximately nine-feet long and three-feet deep. An oil painting covers the inside of the frame. Placed inside the wooden frame are nine carved wooden figures that an artist from Scarsdale sculpted at a cost of approximately $1,625. The figures range in height from approximately six and one-half inches to three and one-half feet. When displayed, the figures portray the birth of Christ.
 
 
 15
 In each year from 1957 through 1982, the Creche Committee submitted a written application to the Board seeking permission to display its creche at Boniface Circle during the Christmas season; from 1957 through 1972, the Board unanimously granted the Committee's applications; from 1973 through 1980, the Board granted the Committee's applications, but minority votes of abstention or denial marked the grants. In 1981 and 1982, the Board voted 4-3 to deny the Committee's requests to display its creche at Boniface Circle.
 
 
 16
 In each year that the Board granted permission to the Committee to display its creche, the Committee neither solicited nor received any funds or assistance from Scarsdale in connection with the storage, erection, display or removal of the creche. In some years prior to 1977, a 40-watt incandescent light bulb within the creche was connected to a municipal light standard at Boniface Circle. From 1958 through 1980, the Committee restored Boniface Circle to its previous condition after the creche was removed. Until 1980, the Committee's applications did not specify a duration for the display of the creche. In 1980 and 1981, the Committee requested that the creche be allowed from December 17 to a date of removal "as soon as possible after the New Year." In 1982, the Committee requested the same period, except beginning on December 16. In 1983, the Committee requested permission to display the creche at Boniface Circle during the 1983 Christmas season.
 
 
 17
 A number of events regarding Scarsdale and the creche began in 1976. First, an attorney and resident of Scarsdale wrote a letter to the Village Attorney indicating that if Scarsdale concluded that the creche could be erected on Village-owned property, he would commence litigation. In December 1976, he did commence an action against Scarsdale and the Creche Committee in the United States District Court for the Southern District of New York seeking a declaration that the placement of the creche on Village-owned property was unconstitutional and an injunction against the Village. The district court dismissed the suit for lack of subject-matter jurisdiction. Russell v. Town of Mamaroneck, 440 F.Supp. 607 (S.D.N.Y.1977) (consolidated with Rubin v. Village of Scarsdale ).
 
 
 18
 Also in 1976, the Board, while granting permission to display the creche, required the Committee to display a small unlit sign beside the creche which read: "This creche has been erected and maintained solely by the Scarsdale Creche Committee, a private organization." In each year from 1976 through 1980, the Committee complied with the Board's sign requirement. Moreover, beginning in 1976, four churches that had been members of the Creche Committee since at least 1960 discontinued their representation on the Committee. The membership thus dropped from eleven churches to seven churches.
 
 
 19
 In 1976, the Board, having established a Scarsdale Human Relations Advisory Council for the purpose of advising it with regard to any human relations problems that might arise in the Village, asked the Advisory Council to give its appraisal as to "how the population of Scarsdale feels about using Boniface Circle for locating the creche." From 1976 through 1978, the Advisory Council recommended that, in the interests of community relations, the Board grant permission to the Committee to display its creche. From 1980 through 1982, although recommending that the Board grant permission to the Committee to use Boniface Circle, the Advisory Council's reports also stated that the creche should be placed on non-public property and that the Committee should seek other sites.
 
 
 20
 In 1979, the Board, though granting permission to the Committee to erect its creche at Boniface Circle, stated, "It was strongly recommended by all the Trustees that the Creche Committee consider rotating the creche among various Village churches in future years." In May 1980, members of the Committee met with members of the Advisory Council to discuss and consider possible alternative locations for the creche. They discussed two business-district locations, the Frog Prince Proper Restaurant and the Manhattan Bank for Savings; the Advisory Council later informed the Committee that those locations were not available. Later in 1980, the last year that the Village granted permission to the Committee to erect its creche at Boniface Circle, the Village's letter to the Committee stated that "Mayor Jensen pointed out that in light of the division caused by this issue, the Board strongly urges that next year the Committee erect the creche at a location other than Village-owned property."
 
 
 21
 As stated, 1981 was the first year that the Board denied the Committee permission to place its creche at Boniface Circle. In November 1981, the Frog Prince Proper Restaurant offered its grounds to the Committee for the display of the creche that year. The Committee accepted the offer and erected its creche there on December 17, 1981.
 
 
 22
 In March 1982, Committee representatives met with former Mayor Jean Stone, the Village Trustees, Village Manager Lowell J. Tooley, members of the Advisory Council, members of the Chamber of Commerce and members of the Scarsdale Police Department to discuss the concept of "Heritage Plaza." The concept was designed to make an area of public land, after transfer to a private entity, available for displays of a patriotic, ethnic, charitable or religious nature as well as for folk-dancing, singing and other social and cultural activities. The plan later proved unworkable.
 
 
 23
 At a special meeting on December 1, 1982, after its Law Committee reported with respect to the creche issue and the state of the law that "there is no unanimity among members," the Board again voted 4-3 to deny permission to the Committee to erect its creche at Boniface Circle. On December 7, 1982, seventeen residents of Scarsdale, four of whom are members of the Citizens' Group, submitted an application to the Board seeking permission to display a different, smaller creche at Boniface Circle from December 18 through December 26 during the 1982 Christmas season. On December 14, 1982, the Board voted 4-3 to deny the application.
 
 
 24
 On February 3, 1983, the Citizens' Group submitted an application to the Board seeking permission to display a creche at Boniface Circle from December 17 through December 26 during the 1983 Christmas season. On February 7, 1983, the Citizens' Group commenced an action in the United States District Court for the Southern District of New York seeking damages, declaratory relief and injunctive relief enjoining Scarsdale and the Board from denying the Citizens' Group access to and temporary use of Boniface Circle based upon the content, nature and purpose of the symbolic speech or expression it sought to present in the public park.
 
 
 25
 On April 12, 1983, the Creche Committee submitted an application to the Board seeking permission to display its creche at Boniface Circle during the 1983 Christmas season. By letter dated April 21, 1983, Scarsdale responded that the placement of a creche at Boniface Circle was the subject of a pending lawsuit and accordingly it was not appropriate to consider the application at that time. On April 28, 1983, the Committee commenced a separate action on essentially the same grounds as asserted in the Citizens' Group's complaint.
 
 
 26
 On June 15, 1983, the district court consolidated the two actions for all purposes. On June 21, the district court granted a motion for summary judgment in favor of the individual defendant Board members holding that they "are protected by the doctrine of qualified immunity [and therefore] all claims against them for damages must be dismissed." Further, the district court granted a motion for summary judgment as to two former Board members because they could not provide any of the equitable relief sought.
 
 
 27
 The case was tried on July 20, 1983, upon a record consisting entirely of stipulated facts, depositions, answers to interrogatories and documentary evidence. On December 8, 1983, the district court issued a thorough opinion granting judgment for the defendants in all respects. McCreary v. Stone, 575 F.Supp. 1112 (S.D.N.Y.1983). This appeal followed.
 
 DISCUSSION
 
 28
 Before framing and discussing the precise issue before this court, it is helpful to discuss briefly several findings and conclusions that the district court made, all of which are uncontested by the parties. First, the district court found that Boniface Circle is a traditional public forum. McCreary, 575 F.Supp. at 1123. It reached this conclusion because:
 
 
 29
 1) the Village has never shown an inclination to legally establish or even describe Boniface Circle as anything other than a park of the kind that is traditionally dedicated to First Amendment activities, and 2) the Village's pattern of granting and denying access to Boniface Circle belies the conclusion that it is either a limited public forum or no public forum at all.
 
 
 30
 Id. The finding that Boniface Circle is a traditional public forum is not clearly erroneous. As Judge Stewart properly noted, Boniface Circle was deeded to the Village in 1931 "for PARK PURPOSES ONLY," and the public since that time has used the park on numerous occasions for a variety of purposes. Id. at 1123-24. See also United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 1706-07, 75 L.Ed.2d 736 (1983) (Parks "are considered, without more, to be 'public forums'.") (citations omitted); Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983); Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (Parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.").
 
 
 31
 After thus characterizing Boniface Circle, the district court proceeded to determine whether the denials of access to Boniface Circle to the Citizens' Group or the Creche Committee were content-based or were based on a content-neutral restriction. See Perry, 103 S.Ct. at 955 (state may enforce exclusion in a public forum that is content-neutral, that is narrowly tailored to serve a significant governmental interest, and that leaves open ample alternative channels of communication; state may enforce content-based exclusion in a public forum only if it shows that the exclusion is necessary to serve a compelling state interest and is narrowly drawn to achieve that end); see also Widmar, 454 U.S. at 270, 102 S.Ct. at 274. The district court determined that the denials herein were content-based. McCreary, 575 F.Supp. at 1125. This determination is supported by the record. As Judge Stewart wrote, "The record makes clear that the historical concern, and by 1981 the reason for denying access, derived from a feeling that because the symbol was religious it should not be on any public land." Id. (emphasis in original). The district court also correctly noted, "The second reason for finding that the denial was content-based is that all other applicants who, like plaintiffs, applied only for access to Boniface Circle were referred to other Village-owned property when their applications to Boniface Circle were denied." Id. Finally, we agree with the district court's findings that a symbol for first amendment purposes may be a form of speech, id. at 1122 n. 5 (noting that the Village conceded this point).
 
 
 32
 The principal issue before us on appeal is whether the Village's content-based denials of the applications to display a creche for a period of approximately two weeks during the Christmas holiday season at Boniface Circle, a traditional public forum, were necessary in order to serve the compelling state interest of avoiding contravention of the establishment clause of the first amendment. The district court, concluding that the denials were proper, McCreary, 575 F.Supp. at 1133, reached its conclusion by partially distinguishing this case from Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Of importance, however, is that the district court at that time did not have the benefit of Lynch v. Donnelly, --- U.S. ----, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), a creche decision with major impact on this litigation. We disagree with the district court's analysis of Widmar in light of Lynch; therefore, we reverse and remand.
 
 
 33
 The first amendment to the United States Constitution states in pertinent part that "Congress shall make no law respecting an establishment of religion ... or abridging the freedom of speech ...." The first amendment, of course, is applicable to the states. Everson v. Board of Education, 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711 (1947); Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The Supreme Court recently has written that the establishment-clause language in the first amendment "is not a precise, detailed provision in a legal code capable of ready application," and that "[t]he purpose of the Establishment Clause 'was to state an objective, not to write a statute.' " Lynch, 104 S.Ct. at 1361-62 (quoting in part Walz v. Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)). Over the years, establishment-clause cases have presented "especially difficult questions of interpretation and application," Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 3065, 77 L.Ed.2d 721 (1983). In this case, we are faced with the additional difficulty of reconciling establishment-clause issues with free-speech issues; however, the recent Supreme Court precedents of Widmar and Lynch help us to "perceive the lines of demarcation," Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), in these important areas of constitutional law.
 
 
 34
 In Widmar, eleven students of the University of Missouri at Kansas City brought suit to challenge a University regulation that prohibited their religious group from meeting in University facilities as other student organizations did. 454 U.S. at 265-66, 102 S.Ct. at 271-72. The Supreme Court, Justice Powell writing, announced that "[t]he Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." Id. at 267-68, 102 S.Ct. at 272-73. Noting that religious worship and discussion "are forms of speech and association protected by the First Amendment," id. at 269, 102 S.Ct. at 273, the Court stated that "[i]n order to justify discriminatory exclusion from a public forum based on the religious content of a group's intended speech, the University ... must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Id. at 269-70, 102 S.Ct. at 273-74.
 
 
 35
 The University in Widmar contended that its regulation was necessary to serve the compelling interest of maintaining separation of church and state as required by the establishment clause. Id. at 270, 102 S.Ct. at 274. The Court agreed that such an interest "may be characterized as compelling," id. at 271, 102 S.Ct. at 275, but that an equal-access policy would not contravene the establishment clause. Id. Referring to the guidance of the three-pronged test established in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the Court noted "that an open-forum policy, including nondiscrimination against religious speech, would have a secular purpose and would avoid entanglement with religion." Widmar, 454 U.S. at 271-72, 102 S.Ct. at 275 (footnotes omitted). Moreover, the Court concluded that the primary effect of the public forum would not be the advancement of religion. Id. at 273, 102 S.Ct. at 276. As to the latter conclusion, the Court explained that incidental benefits do not violate the prohibition against primary advancement of religion, id.; that "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices," id. at 274, 102 S.Ct. at 276; and that the forum in dispute was available to benefit "a broad class of nonreligious as well as religious" groups, id. Finally, the Court held that the University's interest was not "sufficiently 'compelling' to justify content-based discrimination against [the student group's] religious speech," but that "this case in no way undermines the capacity of the University to establish reasonable time, place, and manner regulations." Id. at 276, 102 S.Ct. at 277 (footnote omitted).
 
 
 36
 Less than three years after Widmar, the Supreme Court decided Lynch. In Lynch, the City of Pawtucket, Rhode Island, erected a Christmas display as part of its observance of the Christmas holiday season. The display included figures traditionally associated with the holiday such as a Christmas tree, a Santa Claus house and a virtually life-sized creche. 104 S.Ct. at 1358. The City not only erected and later dismantled the creche, it owned the creche--having originally purchased it--and, in addition, incurred nominal expenses in displaying it each year. Id. Several Pawtucket residents and others brought an action challenging the City's inclusion of the creche in the Christmas display. Beginning with the acknowledgement that total separation of church and state in the absolute sense is not possible, id. at 1358-59, and that the Constitution affirmatively mandates accommodation of all religions, id. at 1359, the Court focused on the creche "in the context of the Christmas season." Id. at 1362. Chief Justice Burger wrote:
 
 
 37
 The District Court plainly erred by focusing almost exclusively on the creche. When viewed in the proper context of the Christmas Holiday season, it is apparent that, on this record, there is insufficient evidence to establish that the inclusion of the creche is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message.
 
 
 38
 Id. at 1362-63. Additionally, the Court noted that the inclusion of the creche did not give aid to religion that was any greater than the benefits and endorsements approved in other Supreme Court establishment-clause cases. Id. at 1364. It stated:
 
 
 39
 We can assume, arguendo, that the display advances religion in a sense; but our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action. The Court has made it abundantly clear, however, that "not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid."
 
 
 40
 Id. (quoting in part Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 771, 93 S.Ct. 2955, 2964, 37 L.Ed.2d 948 (1973)). Moreover, the Court rejected arguments that the City's display of the creche involved forbidden entanglement by the state with the church, Lynch, 104 S.Ct. at 1364, and also decided that an inquiry into potential political divisiveness was not necessary because the dispute did not involve direct subsidies to church-sponsored schools, colleges or other religious institutions. Id. at 1364-65. Finally, the Court held that "notwithstanding the religious significance of the creche," the City did not violate the establishment clause. Id. at 1366.
 
 
 41
 In light of the Supreme Court's dispositions of Widmar and Lynch, we turn now to the instant dispute. Initially, the Creche Committee raises an issue concerning the proper mode of analysis. It argues that the Lemon three-pronged analysis should not be used for guidance by this court. We disagree. The Lemon test asks whether governmental conduct in an establishment-clause case has a secular purpose, whether the principal or primary effect of that conduct advances or inhibits religion and whether the conduct will foster an excessive governmental entanglement with religion. Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111. It is settled that if one prong of the test is breached, the challenged governmental conduct will violate the establishment clause. See, e.g., Stone v. Graham, 449 U.S. 39, 40-41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980) (per curiam). The Lemon test generally has guided courts in the establishment-clause area, Mueller, 103 S.Ct. at 3066, although the Supreme Court has warned that in this area it will not be bound by a single test. Lynch, 104 S.Ct. at 1362; see, e.g., Marsh v. Chambers, --- U.S. ----, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983); Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). We believe that the district court proceeded correctly by applying the Lemon test and we will also use it for guidance. We note that the Supreme Court used the test for guidance in Lynch, 104 S.Ct. at 1362, and in Widmar, 454 U.S. at 271, 102 S.Ct. at 275, and that our court previously has used the test for guidance. See Brandon v. Board of Education, 635 F.2d 971, 978 (2d Cir.1980), cert. denied, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981).
 
 
 42
 The first prong of the Lemon test asks whether the government's conduct in allowing the display of a creche has a secular purpose. Judge Stewart determined that allowing a creche would not violate the establishment clause for want of a secular purpose. McCreary, 575 F.Supp. at 1128. We agree. Widmar teaches that pursuing an open-forum policy that allows equal access for religious as well as nonreligious speech is an acceptable secular purpose. Widmar, 454 U.S. at 271, 102 S.Ct. at 275. As the district judge noted, Widmar is controlling on this prong; therefore, we agree with his resolution.
 
 
 43
 The excessive-entanglement prong of the Lemon test asks whether the government's conduct in allowing the display of a creche will foster excessive governmental entanglement with religion. "Entanglement is a question of kind and degree." Lynch, 104 S.Ct. at 1364. The district judge herein determined that Widmar's admonition, that enforcing an exclusion would involve some entanglement, was appropriate because the Village then would have to determine which symbols presented to it are principally religious. McCreary, 575 F.Supp. at 1128. Further, the district judge determined that the potential-political-divisiveness part of the excessive-entanglement prong was insufficient to constitute an establishment-clause violation. Id. at 1129. We agree with these observations. First, merely allowing access to display a creche would not foster excessive administrative entanglement. In reality, when evaluating an application for display of a creche, the Village will have to do no more than when evaluating any other request for access to its public properties. Further, allowing access would not involve continuing state surveillance, which might be necessary if financial grants were involved, Lemon, 403 U.S. at 621, 91 S.Ct. at 2115, or which might be necessary to ensure compliance with rules excluding religious speech. Widmar, 454 U.S. at 272 n. 11, 102 S.Ct. at 275 n. 11. Additionally, the Village's involvement here would be far less than the involvement of Pawtucket, the sponsor of the creche in Lynch. See 104 S.Ct. at 1358.
 
 
 44
 Lynch has resolved any doubt that may have existed about the district court's resolution of the potential-political-divisiveness contention that the Village continues to emphasize here on appeal. Following a footnoted reference in Mueller, 103 S.Ct. at 3071 n. 11, Lynch specifically limited the potential-political-divisiveness part of the excessive-entanglement prong to cases involving direct subsidies to church-sponsored schools, colleges or other religious institutions. Lynch, 104 S.Ct. 1364-65. Plainly, this is not such a case. Further, Lynch pointed out that potential political divisiveness may not be permitted to invalidate otherwise permissible conduct. Id. at 1364. Justice O'Connor, in her concurring opinion stated that "political divisiveness along religious lines should not be an independent test of constitutionality." Id. at 1367. Thus, even though it was without benefit of Lynch's guidance in this area, we believe that the district court reached the correct conclusion as to excessive entanglement, namely, that this prong of the Lemon test was not violated herein.
 
 
 45
 The primary-effect prong of the Lemon test is violated only if the governmental action has "the direct and immediate effect of advancing religion." Nyquist, 413 U.S. 784 n. 39, 93 S.Ct. at 2971 n. 39. "Comparisons of the relative benefits to religion of different forms of governmental support are elusive and difficult to make." Lynch, 104 S.Ct. at 1363. However, governmental action that provides only indirect, remote or incidental benefits does not violate the establishment clause. Nyquist, 413 U.S. at 771, 93 S.Ct. at 2964. Not surprisingly, our prime area of disagreement with the district court relates to its analysis of this prong because it is with respect to this prong that Lynch has its major impact. The district court determined that Widmar did not control the primary-effect prong because Widmar involved speakers using public property. McCreary, 575 F.Supp. at 1129-30. According to the district court, the crucial inquiry in this case was whether "the manner chosen by the plaintiffs to convey their religious message sufficiently relies on the 'prestige, power and influence' of the Village to constitute an impermissible state advancement of religion." McCreary, 575 F.Supp. at 1130 (quoting School District of Abington Township v. Schempp, 374 U.S. 203, 307, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring)). Using this approach, the district court determined that allowing plaintiffs' creche to stand ten or so days at Boniface Circle would have the direct and immediate effect of advancing religion.
 
 
 46
 We disagree. In Lynch, the Court determined that the display of the creche did not advance religion in general or the Christian faith in particular any more than those benefits and endorsements found not violative of the establishment clause in other Supreme Court cases. 104 S.Ct. at 1363-64. See Marsh v. Chambers, --- U.S. ----, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (chaplain opening state legislative sessions paid with public funds); Roemer v. Board of Public Works, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (plurality opinion) (aid to private institutions of higher learning); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (construction grants); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (free textbooks); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (program allowing release of students during school hours for religious instruction); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (school transportation). The Supreme Court in Lynch acknowledged that the display of the creche would advance religion "in a sense," 104 S.Ct. at 1364, but determined that the effect was indirect, remote or incidental. Id. As we noted earlier, the city involved in Lynch purchased, erected, displayed, sponsored and owned the creche therein. If the Lynch creche was not construed as a primary advancement of religion, a fortiori, the Village's neutral accommodation herein to permit the display of a creche in a traditional public forum at virtually no expense to it cannot be viewed as a violation of the primary-effect prong of the Lemon test and, therefore, violative of the establishment clause. As the Court noted in Widmar, religious benefits derived from the use of an open-access forum are incidental, 454 U.S. at 274, 102 S.Ct. at 276, and the availability of benefits to a broad spectrum of groups is an important index of secular effect. Id.; Mueller, 103 S.Ct. at 3068. Here, there is no doubt that Boniface Circle is available to a broad range of Scarsdale's nonreligious and religious organizations, groups and persons. The district court stated that it did not believe that a broad class of nonreligious and religious symbols will abound in Scarsdale's parks. McCreary, 575 F.Supp. at 1132. However, this belief does not lessen the opportunities for free-speech usage of Scarsdale's public forums, including Boniface Circle. Further, we reject as sheer conjecture any implication that the Village will be overrun with applications for use of the limited space in its public forums. As we will discuss later, the Village has the freedom to enact reasonable, content-neutral time, place and manner regulations regarding the use of its public forums.
 
 
 47
 The district court also attached emphasis to how the creche would appear when placed on Village property. McCreary, 575 F.Supp. at 1131-33. In Lynch, the majority rejected an argument based on appearance advanced by the dissent. 104 S.Ct. at 1364. As previously stated, the Lynch Court indicated that any perception that Pawtucket had aligned itself with the Christian faith by including the creche in its display was not a primary advancement of religion because the benefits conferred in such a situation are indirect, remote or incidental. Id. Moreover, Widmar stated that "an open forum ... does not confer any imprimatur of State approval on religious sects or practices." 454 U.S. at 274, 102 S.Ct. at 276. Under these principles, the Village's actions in permitting access to Boniface Circle for display of a creche--the same actions that would be necessary in permitting access for any display--do "not lead it into such an intimate relationship with religious authority that it appears ... to be sponsoring ... that authority." Roemer, 426 U.S. at 747-48, 96 S.Ct. at 2345-46 (footnote omitted). Additionally, we note that the appearance aspect in this case exists to a much lesser degree than the appearance aspect discussed by the Court in Lynch, 104 S.Ct. at 1364 ("display of the creche is no more an advancement or endorsement of religion than the Congressional and Executive recognition of the origins of the Holiday itself").
 
 
 48
 Finally, the district court also concluded that the appearance of Village support was a problem because "the community viewing the creche includes children who cannot be counted on to 'appreciate that the [Village's] policy is one of neutrality toward religion.' " McCreary, 575 F.Supp. at 1132 (quoting Widmar, 454 U.S. at 274 n. 14, 102 S.Ct. at 276 n. 14). We reject this basis for the district court's holding. This contention causes us to hesitate; however, assuming there is a reason for articulating principles vis-a-vis children separate from those that we have stated above in relation to primary advancement of religion, the record herein contains "little direct testimony," McCreary, 575 F.Supp. at 1128 n. 16, on which to base such a distinction. We note that the Village did not even introduce the kind of evidence that other courts have considered regarding such a theory. See, e.g., Country Hills Christian Church v. Unified School District No. 512, 560 F.Supp. 1207, 1216 (D.Kan.1983) (no studies done regarding theories on children; therefore, psychologist's testimony considered speculative); Citizens Concerned for Separation of Church and State v. City and County of Denver, 526 F.Supp. 1310, 1314-15 (D.Colo.1981) (district court considered evidence presented on the effect of a nativity-scene display on children inconclusive; evidence consisted of expert psychological testimony and a study performed on children).
 
 
 49
 Another appearance aspect of this case concerns the disclaimer sign placed beside the Committee's creche from 1976 through 1980 as a condition for authorization to display the creche at Boniface Circle. The sign measured 10 3/4 inches by 14 1/2 inches, contained letters 1/2 inch high, was unlit and read: "This creche has been erected and maintained solely by the Scarsdale Creche Committee, a private organization." McCreary, 575 F.Supp. at 1118. The district court was of the view that disclaimer-sign details were "minutiae" and, based on its "land as the message bearer" theory, hypothesized that primary-advancement-of-religion problems would not be cured because "it is doubtful that a sign saying that a symbol has been 'erected and maintained' by a private group will entirely eliminate the appearance of state support when public land is still the one visible thing to which the speech may be attributed." Id. at 1132-33. Our view differs. First, Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam), cited by the district court, is inapposite. In Stone, the Court determined that the government did not have a secular purpose for the display of the Ten Commandments in a public school. Id. at 41, 101 S.Ct. at 193. Here the Village has a secular purpose and public schools are not involved. However, we think there is some basis for the district court's concern that while a creche on public land would be visible, the subject sign would not. Therefore, we do not believe that the disclaimer sign should be rejected entirely as a device to further ensure that the creche display will not be attributed to the Village. As the Citizens' Group points out, Allen v. Morton, 495 F.2d 65 (D.C.Cir.1973) (per curiam), is instructive. In Allen, the court determined that a creche would not violate the establishment clause if accompanied by appropriate plaques indicating that the government did not sponsor the event involving the creche. Id. at 67. The court emphasized that the "plaques should be designed for maximum exposure and readability." Id. at 90 (Leventhal, J., concurring). That court noted that the district court, if necessary, should enter an injunction requiring the posting of appropriate plaques. Id. In addition to Allen, the Supreme Court has made reference to disclaimer signs as a proper means of diminishing the likelihood of appearance of support. See Pruneyard Shopping Center v. Robins, 447 U.S. 74, 87, 100 S.Ct. 2035, 2044, 64 L.Ed.2d 741 (1980) (connection with message can be disavowed by "simply posting signs"); see also Lynch, 104 S.Ct. at 1376 (Brennan, J., dissenting). We believe that a proper disclaimer message--especially when coupled with the presence of the valid secular purpose, the lack of excessive entanglement, the Village's general grants of access to its public properties and the publicity the Village's official views have received in Scarsdale--will ensure that no reasonable person will draw an inference that the Village supports any church, faith or religion associated with the display of a creche during the Christmas season at Boniface Circle. Therefore, on remand, we instruct the district court to conduct proceedings and to enter an order concerning the size, visiblity and message of an appropriate disclaimer sign or signs. While we leave the details to the district court's discretion, we note that the sign heretofore displayed appears to us to be too small. As the district judge noted, "It appears that the sign was not readable by persons standing on the perimeter of the park or traveling past Boniface Circle in a car, although the creche could have been recognizable from such at either point." McCreary, 575 F.Supp. at 1118-19. We have no reason to think that this observation is clearly erroneous. Fed.R.Civ.P. 52(a).
 
 
 50
 The Village attempts to distinguish Lynch from the subject situation by referring to Lynch's reference to the Pawtucket creche as presented in the context of "a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights [and] a large banner that reads 'SEASONS GREETINGS'." 104 S.Ct. at 1358. We reject this distinction for two reasons. To begin with, assuming arguendo that the Village's interpretation is correct, the Christmas celebration in the Village is not significantly different than the Christmas celebration described in Lynch. In Scarsdale, the Village is decorated with many traditional symbols of Christmas. Moreover, Boniface Circle has been the recent site of the Christmas Carol Sing and the site of numerous Christmas decorations. More importantly, the Village's reading of Lynch is erroneous as applied to this case. The Supreme Court did not decide the Pawtucket case based upon the physical context within which the display of the creche was situated; rather, the Court consistently referred to "the creche in the context of the Christmas season,"id. at 1362, or the "Christmas Holiday season," id. After determining that the proper context for analysis was the Christmas season, the Court noted:
 
 
 51
 To forbid the use of this one passive symbol--the creche--at the very time people are taking note of the season with Christmas hymns and carols in public schools and other public places, and while the Congress and Legislatures open sessions with prayers by paid chaplains would be a stilted over-reaction contrary to our history and to our holdings. If the presence of the creche in this display violates the Establishment Clause, a host of other forms of taking official note of Christmas, and of our religious heritage, are equally offensive to the Constitution.
 
 
 52
 Lynch, 104 S.Ct. at 1365 (emphasis added). Thus, the Village's display-context argument fails.
 
 
 53
 The Village also contends that Lynch is distinguishable from this case because the creche in Lynch was displayed on private land. We also reject this contention. We fail to find substantiality in this asserted private/public land distinction when comparing the creche in Lynch with either creche in this case. The Pawtucket creche had been displayed for forty or more years with active involvement by the government, including funding, albeit modest in amount, and sponsorship by the city. Here, the Village would merely accommodate a privately-owned creche in a public park that is a traditional public forum. Further, there is no proposed active involvement, sponsorship or financial support by the Village. The cases referred to by the Village, and cited in Justice Brennan's dissent in Lynch, 104 S.Ct. at 1370 n. 1, are not applicable to this case. American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc., 698 F.2d 1098 (11th Cir.1983) (per curiam), involved a permanent religious display on public property. The display of the creche herein in the context of the Christmas season for approximately two weeks falls short of the permanency referred to in Rabun. Id. at 1101-02. Moreover, Gilfillan v. City of Philadelphia, 637 F.2d 924 (3d Cir.1980), cert. denied, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981), concerned a special platform constructed for the Pope to celebrate Mass and to deliver a message to the people of the City of Philadelphia, and involved a substantial financial commitment by the city of over $200,000. 637 F.2d at 927. In addition, the court there determined that the city's actions were undertaken with a religious purpose, id. at 930, that the religious effect of the city's actions was "plain and primary," id. at 931, and that the city had become entangled with religion when preparing the platform, id. at 932. None of these factors is present herein and thus Gilfillan is inapposite. Finally, Fox v. City of Los Angeles, 22 Cal.3d 792, 587 P.2d 663, 150 Cal.Rptr. 867 (1978), is also not helpful to the Village's position. In Fox, the city illuminated on its city hall a huge cross to honor Christmas and Easter Sundays (Latin and Eastern Orthodox). 150 Cal.Rptr. at 867-68, 587 P.2d at 663-64. There the city acted at its own initiative, id. 150 Cal.Rptr. at 875, 587 P.2d at 671 (Bird, C.J., concurring), it placed the cross in position at public expense, id., and it identified itself with the Christian religion, id. 150 Cal.Rptr. at 875, 587 P.2d at 670. Again, none of these factors is present herein.
 
 
 54
 We have noted that establishment-clause cases should be evaluated according to the particular facts before the court. Brandon, 635 F.2d at 973. Adhering to that instruction, we take care to emphasize the narrowness of our ruling and hold only that the Village would not contravene the establishment clause by allowing the display of a creche at Boniface Circle, a traditional public forum, for a period of approximately two weeks during the Christmas holiday season. We point out that the problem with the prohibition herein existed because it was content-based. Our ruling does not affect the ability of the Village to establish reasonable time, place and manner restrictions regarding the use of its public properties, including Boniface Circle. See Widmar, 454 U.S. at 276 & 276 n. 19, 102 S.Ct. at 277 & 277 n. 19. The crucial inquiry in this area is whether the "manner of expression is basically incompatible with the normal activity of a particular place at a particular time." Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). If the manner of expression is compatible, the state may impose "reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication'." Grace, 103 S.Ct. at 1707 (quoting Perry, 103 S.Ct. at 955).
 
 CONCLUSION
 
 55
 For the foregoing reasons, we reverse the judgment of the district court. We remand for the entry of an injunction prohibiting the Village from relying on the establishment clause as a reason for prohibiting the erection of a creche at Boniface Circle, a traditional public forum, for a period of approximately two weeks during the Christmas holiday season; for action regarding a disclaimer sign or signs; and for other such action as is consistent with our determination herein.
 
 
 56
 Reversed and remanded.