**Mark A. KAPLAN, Esquire, Rabbi James S. Glazier, and Reverend Robert E. Senghas,**

v.

**CITY OF BURLINGTON, Sidney C. Baker, Superintendent of Parks and Recreation Department, and Robert Whalen, Operations Manager of Parks and Recreation Department.**

Civ. A. No. 88–168.

United States District Court, D. Vermont.

Dec. 9, 1988.

Richard T. Cassidy, Hoff, Wilson, Powell & Lang, Burlington, Vt., for plaintiffs.

John Franco, Asst. City Atty., Burlington, Vt., for defendants.

## OPINION AND ORDER

BILLINGS, District Judge.

Plaintiffs initiated this action on June 30, 1988, seeking declaratory and injunctive relief preventing defendants from issuing a "Park Special Use Permit" to the Vermont Organization of Jewish Education–Lubavitch ("Lubavitch") for display of a menorah in City Hall Park in Burlington during Hanukkah. Plaintiffs allege that the City's action violates their rights under the establishment clause of the first amendment to the United States Constitution.

Defendants initially moved to dismiss the suit on the grounds that at filing it was both moot and not yet ripe. Hearing on that motion was held on August 1, 1988. On August 29, 1988, this Court issued an Opinion and Order denying defendants' motion to dismiss. The Court noted that, according to plaintiffs allegations, Lubavitch would in all likelihood apply for a permit the following year. Since defendants' policy required the issuance of a permit, the case fell within the "capable of repetition, yet evading review" exception to mootness, particularly because plaintiffs sought declaratory as well as injunctive relief. *See Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 121–22, 94 S.Ct. 1694, 1697–98, 40 L.Ed.2d 1 (1974).[1]

Subsequently, defendants answered the complaint by denying plaintiffs' allegations and counterclaiming for a declaratory judgment that the practice of issuing the permit was proper under federal law and required by the Vermont Constitution.

With Hanukkah rapidly approaching, on November 22, 1988, the parties waived the right to trial on the factual issues in the case and submitted a lengthy stipulation of facts along with cross motions for judgment upon the stipulated facts.[2] The Court

---

1. For a full discussion of the mootness issue, see our Opinion and Order in this case of August 29, 1988.

2. Also on November 22, Lubavitch moved to intervene as a party to the suit. The Court denied the motion as untimely, but granted leave to file briefs as amicus curiae.

held an expedited hearing on the motions on November 30, 1988, at which time three additional exhibits were stipulated for admission.[3] The Court accepts all stipulated facts and finds all exhibits as facts. Also, we take judicial notice that Hanukkah, falling every year on the twenty-fifth day of the Jewish month of Kislev, began this year on the evening of December 3.

Mindful that placement of the menorah was imminent pursuant to the newly-issued permit, the Court issued a short oral opinion and order denying plaintiffs' motion for judgment and granting defendants' motion insofar as it sought to dismiss the complaint. We dismissed defendants' counterclaim for a declaratory judgment, and stated that a more detailed, written opinion would follow. This Opinion seeks to clarify the reasons for the Court's oral ruling of November 30, 1988.

## BACKGROUND

City Hall Park is located in Burlington, Vermont's largest city. It is a plot of land approximately two and one-half acres in size, bounded on the east by the Merchant's Bank, the Old Fire Station, and City Hall. The park is bounded on the south by Main Street, on the west by St. Paul Street, and on the north by College Street. Across each of these streets are numerous business establishments, including banks, restaurants, pharmacies, beauty salons and an Army–Navy surplus store. The Church Street Marketplace, an outdoor pedestrian shopping mall, lies just to the northeast of the Park. City Hall Park is a prominent location in Burlington, around which there is a great deal of vehicular traffic and through which there is a great deal of pedestrian traffic. The parties have stipulated that persons of all "stripes" frequent the Park.

The Park itself contains numerous trees, lampposts, and park benches. Cement public sidewalks border the park on all sides, separating it from the streets and from the Merchants Bank Building, the Old Fire House, and from City Hall. At its center is a circular fountain, and concrete diagonal walkways cross the Park from each corner to the fountain in the center. At the northwest corner of the Park stands a marble monument topped by an American Eagle in memory of Civil War dead. The central fountain is known as the Bicentennial Fountain. To its north is a world globe mounted on a wooden post intended to promote peace. On the eastern side of the Park, near the northern section of City Hall, is a flagpole and a monument which bears the inscription "Dedicated by the first Vermont Gold Star Mothers in Memory of the Boys who Made the Supreme Sacrifice." The Park contains several public phones.

The parties do not dispute that City Hall Park is a public forum. The Park was set aside for the use of the public by the original proprietors of Burlington on or about June 26, 1798. "Title" is in the public, with the City functioning as trustee over the property. The Park is frequently used by members of the public for special purposes, and Chapter 22, Appendix D, of the Code of Ordinances of the City of Burlington sets forth when permits are required for such uses. Pursuant to § 1(D)(2) and (3) of Appendix D, a Special Use Permit is required whenever a group of twenty or more persons will use the Park, or whenever reservation and exclusive use of the Park for a specific time and date or on a continued scheduled basis is sought.[4] Within the last five years, approximately 300 permits annually have been issued. In recent years, no permit request has ever been denied. Most permits are for picnics, family re-

---

**3.** One of these new exhibits, defendants' exhibit A, is the "Park Special Use Permit" issued to Rabbi Yitschok Raskin of Lubavitch for erection of the menorah this year. The permit, approved by Robert Whelan, Operations Manager of the Burlington Parks and Recreation Department, allows the menorah to stand in the northeast section of the Park from December 2 to 12, 1988, and requires a sign disclaiming City sponsorship.

**4.** A Park Special Use Permit is also required whenever an event is open to the public, when the Park is used for commercial or fundraising purposes, for sports events, or when a fee is to be charged. *See* Burlington Code, Ch. 22, App. D, § 1(D).

unions, softball, and the like, but the record indicates a substantial number of permits issued for commercial, religious, miscellaneous, and political or quasi-political activities. The parties agree that the Park is often used for activities involving the exercise of first amendment rights.

In 1986 and 1987, and now again in 1988, Lubavitch has been granted a permit to erect a menorah in City Hall Park during Hanukkah. During 1986 and 1987, the menorah remained in the Park during the entire eight-day period of Hanukkah each year; it is expected that the menorah will remain in the Park this year for at least an eight-day period. The menorah used each year was constructed in Burlington of wrought iron and measures approximately 12 feet wide by 16 feet high. It is a nine-pronged candelabra used to celebrate the Jewish "festival of lights", which commemorates the recapture of the Temple in Jerusalem from the Syrian Greeks in 165 B.C.E. In 1986, and again in 1987, a public lighting ceremony took place which was attended by over 100 people. It is assumed that such ceremony again took place this year on the first night of Hanukkah.

Affixed to the menorah was a sign which read: "Happy Chanukah" "Sponsored by: Lubavitch of Vermont" "Constructed by—Blackthorne Forge Material—Queen City Steel". The record does not indicate the exact size of the sign, but from the photographs it is evident that the sign was in width at least one-quarter the width of the menorah. Although unlighted, the lettering was in high contrast to the background of the sign, and thus was visible to some distance in a westerly direction from the menorah. The lettering on the sign was not directly visible from other directions.

The parties agree and have stipulated that the City of Burlington in no way sponsored, financed, erected, removed, or ex-plicitly endorsed the menorah. Plaintiffs complain, in essence, that the placement of the menorah in City Hall Park—within the proximity of City Hall [5]—conveys the appearance of government endorsement and thus violates the establishment clause of the first amendment. We disagree.

## DISCUSSION

Establishment clause jurisprudence often ranks high in confusion, inconsistency, and emotional fervor. It has provoked an enduring and highly spirited debate, as is evidenced by the arguments in this case. The controversy is often fueled by those who advocate extreme positions: either absolute separation between religion and state—often bordering on state enmity to religion—or those who believe that government may aid religion, as long as it aids all creeds equally.

The Supreme Court's teachings in this area also fluctuate. The decisions map out only a wavering, uncertain course of what is permissible government activity. Each case is narrowly tied to its particular facts. Similarly, commentary by legal scholars and the opinions of the Circuit Courts parallel the Supreme Court's deep ideological divisions. The sheer volume of publication on the subject alone discourages judicial reference, particularly on the district court level.

In addition, only recently have the courts begun to address the boundary lines between establishment clause jurisprudence and the free speech provisions of the first amendment. Here, we are forced to strike a delicate balance between the rights of Lubavitch to free expression in a public forum, and the obligation of the City to avoid violating the establishment clause. As former Chief Justice Burger stated in *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91

---

5. In 1986 and 1987, the menorah was placed in the southeast quadrant of the Park approximately 60 feet west of the west steps of City Hall. Plaintiffs then argued that City Hall stood as a backdrop for the menorah when viewed from certain angles, *see* plaintiffs' exhibit H–1, *et seq.*, and that this vision conveyed a powerful message of government endorsement. The 1988 permit specifies that the menorah be placed in the northeast section of the Park, thus eliminating, at least from most directions, the possibility that City Hall would be seen as a backdrop. Plaintiffs still contend that placement within City Hall Park—which they see as effectively the "lawn" of City Hall—conveys a message of government endorsement. In light of this allegation, we do not think the movement of the menorah renders the case moot.

S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), "Candor compels acknowledgement ... that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law."

In *Lemon v. Kurtzman,* the Supreme Court conceded that its reference to a "wall of separation" between church and state (a metaphor taken from Thomas Jefferson and used in *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1948)), had been an unwise choice of metaphors. "[T]he line of separation, far from being a 'wall', is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." 403 U.S. at 614, 91 S.Ct. at 2112. In *Lemon,* the Court set forth a three-part test used to decide if government conduct violates the establishment clause. The so-called *Lemon* test asks whether government act in question:

(1) has a secular purpose,

(2) has a primary effect which neither advances nor inhibits religion; and

(3) does not foster an excessive government entanglement with religion.

*See Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111–12.

The *Lemon* approach has been criticized as inadequate, *see, e.g., Edwards v. Aguillard,* 482 U.S. 578, ——, 107 S.Ct. 2573, 2605, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting); *Wallace v. Jaffree,* 472 U.S. 38, 112, 105 S.Ct. 2479, 2518, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting), but has been used by the Court on most occasions, sometimes with the caveat that the test is useful but not singularly determinative, *see Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984); *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 485, 106 S.Ct. 748, 751, 88 L.Ed.2d 846 (1986). Although we are mindful that the Court has been hesitant to be constrained by any single test in this area, we think the test retains vitality, and is helpful as guidance in deciding the issues in this case. *See Bowen v. Kendrick,* —— U.S. ——, ——, 108 S.Ct. 2562, 2570, 101 L.Ed.2d 520 (1988) (*Lemon* standard guides "general nature of our in-

quiry"). Government conduct that violates any one prong of the tripartite test of *Lemon* is unconstitutional. *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).

Before addressing each prong of the *Lemon* test, we must first determine upon what "government act" we pass judgment. Here, it appears undisputed that the government act consists merely of issuing a permit for the display of a menorah in City Hall Park, which is conceded by both parties to be a public forum. This is not a case of government financial or physical help to religion. Rather, the claim is simply that to some passers-by, it might appear that by allowing the menorah in the Park, the City sponsored it, was associated with it, or endorsed it.

■ By isolating the government act in question, it is clear that the act does not violate the first prong of the *Lemon* test. The City has a secular purpose, clearly, in allowing expression of all sorts—artistic, political, religious, and controversial—in a public forum. Indeed, the rights of the City to limit expressive activity in a public forum are "sharply circumscribed" by the free speech provisions of the first amendment. *Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). As such, the City correctly believes it is required to issue permits for expressive activity when requested, and it is undisputed that in the recent past, the City has never denied a permit for first amendment activity in the Park. Nor is there any doubt that City Hall Park is a traditional public forum. Set aside for public use by the original proprietors of Burlington, it has "immemorially been held in trust for the use of the public and, time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

■ Skipping to the third prong of the *Lemon* test, the parties as much as agree that no excessive entanglement with religion is fostered by the government's act.

Certainly, the permit application process itself—which was the only formal contact between the City and Lubavitch—is not excessive entanglement. The establishment clause does not require that there be no contact whatsoever between state and religion. *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 760, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973). Plaintiffs point out that the Parks Department did provide maintenance services at City Hall Park including landscaping, mowing and snow-plowing, which, they claim, "facilitated" the display of the menorah. Plaintiffs have not shown, however, that such minimal maintenance led to excessive entanglement between church and state, nor have they even alleged that the area immediately adjoining the menorah was in fact landscaped, mowed, or plowed during the time the menorah was on display.[6]

■ Plaintiffs also claim that the placement of the menorah has created political divisiveness in Burlington. Apparently, the menorah and this resulting lawsuit have received widespread press attention in such papers as The New York Times, The Burlington Free Press, and the Valley News of West Lebanon, New Hampshire. A number of city agencies received telephone calls about the menorah, some in support, and some in opposition. Some unfortunate calls mistakenly suggested that the menorah was permitted only because the Governor of Vermont and/or the Mayor of Burlington are Jewish. On December 18, 1987, Burlington City Attorneys called a news conference to disavow any city sponsorship of the menorah.

We are not persuaded that such divisiveness alone constitutes excessive entanglement or establishes an independent violation of the establishment clause. *See Bowen v. Kendrick,* —— U.S. ——, —— n. 14, 108 S.Ct. 2562, 2518 n. 14, 101 L.Ed.2d 520 (1988); *Lynch,* 465 U.S. at 684, 104 S.Ct. at 1365. In *Lynch v. Donnelly,* the Court held that a litigant could not, by bringing a lawsuit, "create the appearance of divisiveness and then exploit it as evidence of entanglement." 465 U.S. at 684–85, 104 S.Ct. at 1365. Thus, any controversy engendered by this lawsuit itself must be ignored. In addition, we agree with Justice O'Connor's concurrence in *Lynch* that political divisiveness, although potentially relevant, should not be an independent test of constitutionality. *Lynch,* 465 U.S. at 689, 104 S.Ct. at 1367 (O'Connor, J. concurring). Measuring the potential for political divisiveness before a government act is taken would be too speculative an endeavor upon which to pin constitutional distinctions. Even after government acts, there is no principled way for a court to measure divisiveness, or to determine how much is too much. Rather, the existence of political divisiveness may provide some evidence that institutional entanglement is excessive, or that government actions are perceived as an endorsement of religion. "But the constitutional inquiry should focus ultimately on the character of the government activity that might cause such divisiveness, not on the divisiveness itself." *Id.* In making this inquiry, we note that the fact that "public debate of religious ideas, like any other, may arouse emotion, may incite, may foment religious divisiveness and strife does not rob it of constitutional protection." *McDaniel v. Paty,* 435 U.S. 618, 640, 98 S.Ct. 1322, 1335, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring).

We turn now to the second prong of the *Lemon* test, whether the city's approval of the permit has a primary effect which neither advances nor inhibits religion.

The second prong of the *Lemon* test is the most sticky of the three prongs, as we view that the real meat of plaintiff's claim is that the placement of the menorah conveys the appearance of government endorsement of a particular religion, and thus has a primary effect of advancing religion. Of course, the parties realize that the government is not intending such result. Rather, plaintiffs claim, even if the impres-

---

**6.** Of course, any direct or indirect benefit conferred on Lubavitch as a result of these exiguous services is *de minimis* for purposes of the second *Lemon* prong. *See Lynch,* 465 U.S. at 684, 104 S.Ct. at 1365.

sions of government endorsement were wrong, they were reasonable "given the juxtaposition of the menorah with the most powerful symbol of government authority, City Hall." Plaintiffs' Hearing Memorandum at 20.

■ We agree that a perceived endorsement of religion, even if erroneous, could result in a violation of the establishment clause. This principle finds support in Justice O'Connor's concurrence in *Lynch, see* 465 U.S. at 690–92, 104 S.Ct. at 1368–69, and underlies the holdings in *ACLU v. County of Allegheny*, 842 F.2d 655 (3d Cir.) *cert. granted,* —— U.S. ——, 109 S.Ct. 53, 102 L.Ed.2d 32 (1988) and *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir.1987). This erroneous perception of endorsement, however, must be objectively reasonable in light of all the circumstances in the case. Particularly where a public forum is involved, we think plaintiffs must carry a heavy burden to prove that by merely allowing the speech, the City violates the establishment clause.

■ Indeed, for the City to enforce a content-based exclusion of religious speech, which plaintiffs urge, the regulation must be necessary to serve a compelling state interest and narrowly drawn to achieve that end. *Perry*, 460 U.S. at 45, 103 S.Ct. at 954. Religious speech, like political or artistic expression, is protected by the free speech component of the first amendment. *Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981). It is true that maintenance of separation between church and state to avoid violation of the establishment clause may be characterized as a compelling government interest. *Id.* at 271, 102 S.Ct. at 275. Nonetheless, for this interest to be implicated, plaintiffs must first show that content-based restrictions on speech are necessary and narrowly tailored to avoid a violation of the establishment clause. *Widmar*, 454 U.S. at 270–77, 102 S.Ct. at 274–78; *McCreary v.*

*Stone*, 739 F.2d 716 (2d Cir.1984), *aff'd by an equally divided Court*, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985).

The situation in this case, we find, is unlike the *Allegheny* case, where a creche and menorah were located *inside* the main entrance of a county courthouse; it is also unlike the *American Jewish Congress* case, where a nativity scene was located *within* city hall. Neither case involved the placement of a religious symbol in a traditional public forum, and in those cases, the appearance of endorsement was arguably more objectively reasonable than here. This case, in contrast, is most akin to *McCreary v. Stone*, which we are bound to follow. In *McCreary*, the Second Circuit *required* the Village of Scarsdale to allow the placement of a creche in Boniface Circle, which was found to be a public forum.

Plaintiffs would like to see *McCreary* overturned, but realizing this Court's inability to do so, plaintiffs have attempted to distinguish *McCreary* on two grounds. First, plaintiffs argue that the proximity to Burlington's City Hall sets this case apart from *McCreary*. Second, they argue that a menorah, as distinguished from a creche, is a "singularly religious artifact" that has no place even in a public forum.

Plaintiffs' first argument goes to the objective reasonableness of the mistaken perceptions of city endorsement. Plaintiffs rely on complaints received and the political divisiveness that resulted in Burlington as a result of the menorah's placement. This argument, however, rests on the shaky foundations of the subjective views of some observers of the menorah.[7] In effect, plaintiffs argue that the subjective, and erroneous, views of some observers—their belief that the City sponsored the menorah —are enough to establish a violation by the City. We reject this argument because we believe these views were not objectively reasonable.[8] In making this determination, we agree with Justice O'Connor that "whether a government activity communi-

---

7. The parties have stipulated that at least some of the calls and letters that the City received concerning the menorah were blatantly anti-semetic. *See, e.g.,* defendants exhibit B. In the Court's view, this undermines the weight of these public reactions in determining whether it

is objectively reasonable to conclude that the City communicated an endorsement of religion.

8. We also question whether these plaintiffs have standing to raise a challenge based on such narrow grounds. Plaintiff Kaplan is an attor-

cates endorsement of religion is not a question of simple historical fact. ... [it is] in large part a legal question to be answered on the basis of judicial interpretation of social facts." *Lynch*, 465 U.S. at 693–94, 104 S.Ct. at 1369–70 (concurring opinion); *See also Id.* at 683, 104 S.Ct. at 1364 (majority opinion) (rejecting assertion that religion is advanced because some observers may perceive the City has endorsed Christianity by displaying the creche).

In light of all the circumstances of the case we cannot conclude that the City's conduct here objectively communicates endorsement of religion. The visual backdrop for the menorah depends entirely on the viewer's angle of vision; the prominent disclaimer on the menorah was understandable and visible within a reasonable distance of the menorah;[9] the City called a press conference disclaiming sponsorship of menorah and explaining that the Park was open to everyone. Most importantly, the menorah was placed within a park, long set aside, well known, and in continuous use as a public forum; it was not placed in or on a government building. The fact that the Park is continually used by others for expressive purposes is "an important index of secular effect." *See Widmar*, 454 U.S. at 274, 102 S.Ct. at 276. We reject plaintiffs characterization of the Park as "in effect" the lawn of City Hall.

■ Applying this analysis we cannot say that the government's act of allowing the menorah has a primary effect of advancing religion. This is particularly true in light of *Lynch v. Donnelly*, 465 U.S. at 683, 104 S.Ct. at 1364, where the Court held that an "indirect, remote, and incidental" benefit to religion would not violate the clause, and *Nyquist*, 413 U.S. at 784 n. 39, 93 S.Ct. at 2971 n. 39, where the Court stated that the primary effect prong of the *Lemon* test was violated only if the government's action has "the direct and immediate effect of advancing religion".

In this case, we find at most an indirect, remote, or incidental benefit, and thus hold that the City has not violated the second prong of the *Lemon* test.

■ We also reject plaintiffs' argument that a menorah is a distinctly religious artifact and should thus be banned from public property. Such a rule would require government officials in each case to delve into the history, origin and "religiosity" of an item or display. Such a result, we think, would more clearly violate the entanglement prong of the *Lemon* test and the free speech provisions of the first amendment. *See Widmar*, 454 U.S. at 269–70 & n. 6, 102 S.Ct. at 274–75 & n. 6. It would force government officials to inquire, and

---

ney practising in Burlington; plaintiff Glazier is a Rabbi for the Temple Sinai Reformed Jewish Congregation in South Burlington; plaintiff Senghas is a minister of the First Unitarian Universalist Church of Burlington. These plaintiffs are literate and educated individuals who were able to read the menorah's disclaimer, understand the press conference disclaiming city sponsorship, and most importantly, have some concept of the meaning of a public forum. Although we do not question the allegation that plaintiffs "believe strongly in the principle of separation of church and state, and suffer mental anguish when confronted with a graphic violation of that principal" (complaint ¶ 22), we find it hard to believe that *these* plaintiffs actually thought the City was endorsing religion by granting the permit. Rather, plaintiffs in essence complain that other individuals—not them—might get the wrong impression.

Of course, the issue of standing in establishment clause cases is not well-settled, as standing is often unquestioned. *See Bowen v. Kendrick*, — U.S. —, — — —, 108 S.Ct. 2562, 2579–80, 101 L.Ed.2d 520 (1988). We need not tackle

this thorny issue as we resolve the case on other grounds.

9. Plaintiff argues that a certain percentage of the adult population is illiterate, and that children frequent the park who might not be able to read or understand the sign. While this might be true, we do not think it changes the result in the case. First, the disclaimer is but one factor in the totality of the circumstances that contributes to this Court's conclusion that the City did not objectively convey a message of endorsement of religion. Second, we do not believe that government conduct must always be perfectly understood by 100% of observers. Were this the case, it would place an intolerable burden indeed on government. No matter how careful the City might be, for instance by the imposition of appropriate time, place and manner restrictions on speech, there will always be someone who misunderstands the city's obligation to allow speech in a public forum or who simply dislikes the group or idea being presented.

to make such decisions; in effect, to act as censors. An unfettered discretion in the municipality would result in a clear violation of the free speech clause. *See City of Lakewood v. Plain Dealer Publishing Co.,* — U.S. ——, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Moreover, we do not think that such distinctions are always easy or clearly made.

## CONCLUSION

For the reasons stated, we find that Burlington's conduct did not violate the establishment clause of the United States constitution. We DENY plaintiffs' motion for judgment and GRANT defendants' motion insofar as it seeks to dismiss the complaint. In light of our resolution of the case, we find the declaratory relief sought by defendants unnecessary and DISMISS the counterclaim for a declaratory judgment. Since plaintiffs are not prevailing parties, the claim for attorneys fees and costs pursuant to 42 U.S.C. § 1988 is DENIED.

SO ORDERED.